## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GST, INC.,[1] | ) | Case No. 25-12188 (KBO) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN SENIOR SECURED POSTPETITION FINANCING AND (B) USE CASH COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

GST, Inc., as debtor and debtor-in-possession (the "Debtor" or the "Company") in the above-captioned chapter 11 case (this "Chapter 11 Case"), hereby submits this motion (this "Motion") seeking (i) entry of an interim order, substantially in the form annexed hereto as **Exhibit A** (the "Interim Order"), and (ii) following the Final Hearing (as defined herein), entry of a final order granting the relief requested herein (the "Final Order" and, together with the Interim Order, the "DIP Orders"),[2] authorizing the Debtor to obtain postpetition secured financing, approving the DIP Credit Agreement (defined below), granting perfected liens to secure the DIP Obligations, granting adequate protection, granting related relief including if consent is later granted authorizing the use of cash collateral, and scheduling a final hearing on the Motion.

In support of the Motion, the Debtor relies upon and fully incorporates by reference the *Declaration of Nicholas Rubin in Support of the Debtor's Chapter 11 Petition and First Day*

---

[1] The last four digits of the Debtor's taxpayer identification number are 1002.  The Debtor's corporate headquarters and service address is 322 Culver Boulevard, Suite 150, Playa Del Rey, CA 90293.

[2] The Debtor will file the form of Final Order prior to the Final Hearing (as defined herein).

*Pleadings* (the "Rubin Declaration"), filed contemporaneously with this Motion,[3] and respectfully

states as follows:

## PRELIMINARY STATEMENT

1.        By this Motion, the Debtor respectfully requests that the Court grant authorization,

pursuant to sections 364(c) and (d) of the Bankruptcy Code, to obtain a DIP Facility (as defined

below) from Winners Alliance, Inc. (the "Prepetition Lender" or the "DIP Lender"), which will

provide the Debtor with the liquidity necessary to continue operations, preserve its estate, and

pursue a successful reorganization.

2.        The Debtor requires access to the DIP Facility to fund this Chapter 11 Case and to

effectuate one or more going-concern transactions, through a chapter 11 plan or sale under

Bankruptcy Code section 363 (or a combination of the foregoing), that maximizes recoveries for

all stakeholders. As of the Petition Date, the Debtor has approximately $143,000 in cash on hand,

all of which is subject to existing liens of the Prepetition Lender. The Prepetition Lender has

consented to the Debtor's use of Cash Collateral pursuant to the terms of the proposed Interim

Order and the Budget. However, even with the use of the Cash Collateral on hand, the amount is

not enough to fund the administration of this Chapter 11 Case. Thus, postpetition financing under

the DIP Facility is necessary for the Debtor to have access to sufficient liquidity to maintain

ongoing day-to-day operations, and fund working capital needs and expenses incurred

administering its estate.

3.        The Debtor proposes a roll-up of a portion of its Prepetition Secured Obligations in

connection with the DIP Facility, which is critical to securing the necessary financing. The roll-up

provisions reflect the best available financing option and are the result of extensive arms'-length

---

[3]  Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to such terms in the Interim Order and the DIP Credit Agreement, as applicable.

negotiations with the DIP Lender. Given the Debtor's financial condition and the lack of other viable financing options, the roll-up is a necessary feature to secure liquidity and ensure that the Debtor can continue operations. The Debtor submits that the roll-up is fair, reasonable, and appropriate under the circumstances and should be approved.

4.     Although the DIP Lender is an insider of the Debtor, the Debtor submits that the proposed DIP Facility is appropriate and necessary under the heightened scrutiny standard applicable to insider transactions. The Debtor has engaged in arms'-length negotiations with the DIP Lender and has reviewed the terms of the DIP Facility with its independent financial advisors. Given the absence of alternative financing options and the urgent need for liquidity, the Debtor believes that the DIP Facility provides the best available terms and serves the best interests of the estate. The Debtor solicited eleven (11) debtor-in-possession financing proposals, but to date has only received a debtor-in-possession financing proposal from the DIP Lender. The terms of the DIP Facility were scrutinized by the independent member of the Debtor's board of directors, and no other financing proposal was offered to the Debtor. If the Debtor is unable to gain access to the DIP Facility, the proposed path to a successful emergence of the Chapter 11 Case and the Debtor's value as a whole would be materially and irreparably harmed. Absent the liquidity provided by the DIP Facility and use of Cash Collateral, the Debtor likely would, among other things, be unable to continue its operations or pay administrative costs and expenses.

5.     The relief requested by this Motion is a necessary step to preserving the Debtor's operations and serves as a bridge to emerging from the Chapter 11 Case, which is the optimal result for the Debtor's estate and all of its stakeholders. On this record, and as the Debtor is prepared to demonstrate at the interim hearing on this Motion and at the Final Hearing, the relief requested herein represents a sound exercise of the Debtor's business judgment, meets the

heightened scrutiny of a transaction between a debtor and its insider, and should therefore be approved.

**RELIEF REQUESTED**

6.      By this Motion, the Debtor respectfully requests entry of the DIP Orders and the following relief as provided therein:

a.      ***DIP Facility****:* authorizing the Debtor to obtain post-petition debtor-in-possession financing from the DIP Lender pursuant to a senior secured super-priority term loan (the "<u>DIP Facility</u>"), consisting of the following components  (i) a new money multi-draw term loan facility in the aggregate principal amount of up to $1,100,000 (the "<u>Interim New Money DIP Loans</u>"); (ii) during the period from the entry of this Interim Order through and including the earlier of (x) the entry of the Final Order or (y) the DIP Termination Date (as defined in the Interim Order), upon each advance of Interim New Money DIP Loans, a "roll-up" of the Debtor's Prepetition Secured Obligations (as defined below) under the Prepetition Credit Agreement in an amount equal to such advance (the "<u>Interim Roll-Up DIP Loans</u>"), which shall be automatically rolled up, refinanced, and converted into postpetition obligations under the DIP Facility on an equal basis; (iii) a new money term loan facility in the aggregate principal amount not to exceed $1,800,000 (the "<u>Final New Money DIP Loans</u>," together with the Interim New Money DIP Loans, the "<u>New Money DIP Loans</u>"); and (iv) upon entry of the Final Order, a roll-up of $3,250,000 of the Prepetition Secured Obligations (the "<u>Additional Roll-Up DIP Loan</u>," together with the Interim Roll-Up DIP Loans, the "<u>Rolled-Up DIP Loans</u>," and, together with the New Money DIP Loans, the total "<u>DIP Loans</u>"), as further detailed in the DIP Documents (as defined below);

b.      ***DIP Documents***: authorizing the Debtor to execute, deliver, and enter into the *Senior Secured Superpriority Debtor-in-Possession Credit and Security Agreement* (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>DIP Credit Agreement,</u>" and together with the schedules and exhibits attached thereto, and all agreements, documents, instruments, and amendments executed and delivered in connection therewith, the "<u>DIP Documents</u>"), in substantially the form annexed to the Interim Order as **Exhibit 1**, and to perform all of the Debtor's obligations thereunder, and such other and further acts required in connection with the DIP Documents;

c.      ***DIP Obligations***: authorizing the Debtor to enter into the DIP Facility and to incur all obligations owing thereunder and under the DIP Documents to the DIP Lender (including the fees and expenses of the Lender Professionals and all other Indebtedness, the "<u>DIP Obligations</u>"), and granting the DIP Lender allowed superpriority administrative expense claim status in the Chapter 11 Case and in any Successor Case, subject to the Carve-Out;

d.   ***DIP Liens***: authorizing the Debtor to grant to the DIP Lender, and authorizing the Debtor to incur, the DIP Liens (as defined below) in all DIP Collateral to secure the DIP Obligations (including in respect of the Interim Roll-Up DIP Loans), which liens and security interests shall be automatically perfected, on the terms and conditions set forth herein and in the applicable DIP Documents, subject to the Carve-Out;

e.   ***Proceeds of DIP Facility***: authorizing the Debtor to use proceeds of the DIP Facility in accordance with this Interim Order and the DIP Documents, including in accordance with the Budget (subject to Permitted Variances, unless otherwise expressly specified in the DIP Credit Agreement) as required herein;

f.   ***Fees and Expenses***: authorizing and directing the Debtor to pay the principal, interest, fees, expenses, and other amounts payable and reimbursable under the DIP Documents or this Interim Order as such become earned, due, and payable, including, without limitation, the reasonable fees and disbursements of the DIP Lender (including, without limitation, the Lender Professionals), as and to the extent provided in, and in accordance with, the applicable DIP Documents and this Interim Order;

g.   ***Cash Collateral***: authorizing the Debtor to use the proceeds of the DIP Loans and the collateral under the Prepetition Credit Agreement (the "Prepetition Collateral"), including Cash Collateral (as defined below), in accordance with the terms hereof, including pursuant to the Budget (as defined below), as further described herein, to (a) pay fees, interest, and expenses under the DIP Facility; (b) provide working capital for, and for other general corporate purposes of, the Debtor, including for funding the Carve-Out; (c) pay for bankruptcy-related costs and expenses; and (d) pay Adequate Protection Obligations;

h.   ***Adequate Protection***: granting adequate protection, with respect to the Debtor, to the Prepetition Lender, on the terms set forth in the DIP Documents and this Interim Order, for any diminution in value of its interests in the Prepetition Collateral, including Cash Collateral, resulting from, among other things: (i) the use of Cash Collateral during the Chapter 11 Case; (ii) the use, sale, or lease of any of the Prepetition Collateral; (iii) the imposition of the automatic stay pursuant to Bankruptcy Code section 362(a); and/or (iv) for any other reason for which adequate protection may be granted under the Bankruptcy Code (collectively, the "Diminution in Value");

i.   ***Automatic Stay:*** authorizing a modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the other DIP Documents;

j.   ***Immediate Effectiveness***: granting a waiver of any applicable stay with respect to the effectiveness of the Interim Order (including a waiver pursuant to Bankruptcy Rule 6004(h)) and providing for immediate effectiveness of this Interim Order;

k.      ***Final Hearing***: scheduling a final hearing (the "Final Hearing") to consider approval of the relief requested in this Motion on a final basis and entry of the Final Order, and approving the form of notice with respect to the Final Hearing; and

l.      ***Further Relief***: granting the Debtor such other and further relief as is appropriate.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Chapter 11 Case and this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8.      Venue of this Chapter 11 Case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested in this Motion are sections 105(a), 361, 362, 363, 364, 503, 506, 507 and 552 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

9.      Pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final judgment or order on this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

10.      On December 11, 2025 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtor is authorized to continue to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.      No statutory committee of unsecured creditors has been appointed by the Office of

the United States Trustee for the District of Delaware (the "U.S. Trustee") and no trustee or examiner has been appointed in the Chapter 11 Case.

12.     Additional details regarding the Debtor, its business, and the events leading to commencement of this Chapter 11 Case, are set forth in the Rubin Declaration and are incorporated herein by reference.

## PROPOSED POSTPETITION FINANCING

13.     The DIP Facility contemplates a postpetition senior secured superpriority debtor in possession multi-draw term loan facility, in an aggregate principal amount of up to $2,900,000 of new money. The Debtor, its legal and financial advisors, and the DIP Lender engaged in arms'-length, good faith negotiations regarding the terms offered by the DIP Lender. Over the course of multiple weeks, the Debtor and the DIP Lender, with the assistance of their respective legal and financial advisors, worked to negotiate the most favorable terms of the DIP Facility. Given the nature of the Debtor's business, the Debtor was unable to obtain any other source of financing, and such efforts would have been futile in light of the Debtor's existing capital structure.

14.     The terms and conditions of the DIP Facility, including the interim partial and final roll-up of a portion of the Prepetition Obligations, are fair and reasonable under the circumstances, especially in light of the Debtor's need for postpetition financing and its capital structure, among other factors. The terms and covenants contained in the DIP Documents are the result of negotiation and are an integral component of the overall terms of the DIP Facility, which in turn is integral to the broader success of the Chapter 11 Case.

15.     Additionally, the DIP Credit Agreement contemplates certain milestones (the "DIP Milestones") that the Debtor must meet throughout the Chapter 11 Case, the failure of which would constitute an Event of Default under the DIP Documents. These DIP Milestones have been negotiated with the DIP Lender and are essential to ensure the Debtor remains on track toward a

successful restructuring or sale. The Debtor intends to meet these DIP Milestones in order to maximize the value of the estate and benefit all stakeholders.

16.     Moreover, as a condition to the extension of credit under the DIP Documents, the DIP Lender and the Debtor have agreed that proceeds of any advance made under the DIP Documents shall be used exclusively in a manner consistent with the Budget (subject to Permitted Variances). No portion of the proceeds of any advance under the DIP Documents or any Cash Collateral shall be used, directly or indirectly, to make any payment or prepayment that is prohibited under the DIP Documents. The Debtor's initial budget (the "Budget") reflecting the anticipated cash receipts and anticipated disbursements for each week during the period from the Petition Date through and including the end of the thirteenth week following the Petition Date, is annexed to as **Exhibit 2** to the Interim Order.

17.     The Debtor submits that the DIP Facility and Budget, taken as a whole, are reasonable under the facts and circumstances, were negotiated at arms'-length and in good faith, and are the Debtor's best—and in fact only—currently available option.

18.     The DIP Facility will provide the Debtor with a smooth landing into the Chapter 11 Case and a viable path forward that will maximize the value of the Debtor's estate for the benefit of all stakeholders. For the reasons set forth above, the Debtor respectfully requests that the Court grant the relief requested in this Motion, including authorization to enter into the DIP Facility, use Cash Collateral, and provide adequate protection to the Prepetition Lender, along with the immediate access to liquidity necessary to ensure the Debtor's continued operations and successful reorganization. The Debtor further requests that the Court schedule the Final Hearing on this Motion at the earliest possible date to ensure timely approval of the DIP Facility and allow the Chapter 11 Case to proceed without disruption.

## CONCISE STATEMENTS PURSUANT TO
## BANKRUPTCY RULE 4001(b) AND LOCAL RULE 4001-2[4]

19.    The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY | |
| --- | --- |
| **Borrower**<br><br>Bankruptcy Rule 4001(c)(1)(B) | GST, Inc., in its capacity as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code ("<u>Borrower</u>")<br><br>*See* DIP Credit Agreement at 1. |
| **DIP Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Winners Alliance, Inc. ("<u>Lender</u>")<br><br>*See* DIP Credit Agreement at 1. |
| **Term**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(B), (a)(ii) | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "<u>Maturity Date</u>"):<br><br>(a)   the earliest to occur of (a) the date that is one Business Day after the closing of the sale of all or substantially all of the DIP Collateral; (b) the date that is one Business Day after the Effective Date of a confirmed Chapter 11 Plan; or (c) the date that is 120 days following the Petition Date (the "<u>Final Maturity Date</u>");<br><br>(b)   the date upon which the Interim Order expires if the Final Order has not been entered on or before the date that is thirty-five (35) days after the Petition Date,<br><br>(c)   the conversion of the Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code,<br><br>(d)   the consummation of the sale of all or substantially all of the assets of the Borrower, taken as a whole, pursuant to section 363 of the Bankruptcy Code, |

---

[4]   This summary is qualified in its entirety by reference to the applicable provisions of the DIP Documents. To the extent there exists any inconsistency between this summary and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control. Any capitalized terms used but not otherwise defined in these summaries shall have the respective meanings ascribed to such terms in the DIP Documents and/or the Interim Order, as applicable. The Debtor reserves the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2 herein.

| SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY | |
|---|---|
| | (e)    the occurrence of the Effective Date of a Chapter 11 Plan; and<br><br>(f)    the date of the acceleration of the Loans and termination of the New Money DIP Commitments.<br><br>*See* DIP Credit Agreement at §§ 1.01, 2.04. |
| **Commitments**<br><br>Bankruptcy Rule 4001(c)(1)(B);<br><br>Local Rules 4001-2(a)(i)(E); 4001-2(a)(ii) | The New Money DIP Loan will be available by multiple draws in an aggregate principal amount of up to $2,900,000. Subject to the conditions set forth in "Conditions to Effectiveness" and "Funding Conditions" in the DIP Credit Agreement, (i) the amount of the New Money DIP Loans to be available following entry of the Interim Order by the Court shall be $1,100,000, and (ii) subject to the entry of the Final Order, up to an additional $1,800,000 will be made available to the Borrower.<br><br>*See* DIP Credit Agreement at 1, § 1.01. |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Loans under the DIP Facility will bear interest at a rate of 14.5% simple interest per annum. At any time when an Event of Default under the DIP Facility has occurred and is continuing, outstanding amounts under the DIP Facility shall bear additional interest at the rate of 6% per annum.<br><br>*See* DIP Credit Agreement, § 2.05(a). |
| **Use of DIP Facility**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | The proceeds of the New Money DIP Loans will be used to provide liquidity for the Debtor throughout the Chapter 11 Case solely in accordance with (i) the DIP Credit Agreement, and (ii) the Budget approved by the Lender.<br><br>*See* DIP Credit Agreement at 1, 2. |
| **Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The use by the Borrower of the Loans and other credit extensions under the DIP Credit Agreement and the DIP Documents shall be in compliance with the Budget, the DIP Documents, and the DIP Orders. The Lender (i) may assume that the Borrower will comply with the Budget, (ii) shall have no duty to monitor such compliance, and (iii) shall not be obligated to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to the Budget or unpaid expenses that the Borrower may have failed to include in the Budget. The line items in the Budget for payment of interest, expenses, and other amounts to the Lender are estimates only, and the Borrower remains obligated to pay any and all DIP Obligations in accordance with the terms of the DIP Documents and the DIP Order, regardless of whether such amounts exceed such estimates. Nothing in the Budget shall constitute an amendment or other modification of any DIP Document or any of the borrowing restrictions or other lending limits set forth therein. |

| SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY | |
|---|---|
| | *See* DIP Credit Agreement, § 6.17. |
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Each line item in the Budget is subject to a permitted negative variance of (i) 10% per week above the projected aggregate disbursements set forth in the Budget, (ii) 10% per week, on disbursement on a by-line-item basis, and (iii) 10% per rolling four-week period, then ending, on the revenue set forth in the Budget. Any unused amounts in the Budget during any one-week period may be carried forward to future weekly periods and applied to any amount by which that same line-item, and only that same line-item, exceeds its projected use as set forth in the Budget, such that the cumulative-to-date budgeted amount for each line item is available without causing such future weekly periods to exceed the allowable variance.<br><br>*See* DIP Credit Agreement, § 7.23. |
| **Expenses and Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement provides for payment of (i) all Lender's Expenses and all reasonable and documented out of pocket expenses incurred by Lender in connection with the documentation and negotiation of the DIP Credit Agreement and the other DIP Documents and in connection with the Chapter 11 Case through and after the Effective Date and (ii) an Exit Fee of 2.0% multiplied by the aggregate principal amount of all New Money DIP Loans advanced under the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, § 2.07 |
| **Collateral and Priority**<br><br>Bankruptcy Rules 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii)<br><br>Local Rules 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | Upon the entry of the DIP Order and subject to its terms, the DIP Obligations will be secured by a valid and perfected lien on all of the DIP Collateral (the "<u>DIP Liens</u>"), subject to the Carve-Out, with priority pursuant to section 364(c)(2) and 364(c)(3) on an interim basis and pursuant to section 364(d) on a final basis.<br><br>*See* DIP Credit Agreement, § 5.15; Interim Order ¶ 7. |
| **Covenants**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary covenants for debtor in possession financings of this type, including certain financial reporting and adherence to the Budget.<br>*See* DIP Credit Agreement, Art. 6, 7. |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Any of the following shall constitute an "Event of Default":<br><br>(i)    <u>**Non-Payment**</u>. Borrower fails to pay, when and as required to be paid herein, any amount of principal of any Loans, any interest on any Loans, premium or any fee due hereunder, or any other amount payable hereunder or under any other DIP Document; or<br><br>(ii)    <u>**Specific Covenants; Other Defaults**</u>. Borrower fails to perform or observe (i) any term, covenant, or agreement contained in any |

| | |
|---|---|
| **SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY** | |

|  |  |
|---|---|
|  | of Article VI (Affirmative Covenants) or Article VII (Negative Covenants) of this Agreement, or (ii) any other term, covenant, or agreement contained in any DIP Document on its part to be performed or observed which failure under this clause (ii) has not been remedied or waived within five (5) Business Days after receipt by Borrower of written notice thereof from Lender; *provided* that Borrower expressly acknowledges that the failure to meet any Milestones under Section 6.16 and covered under clause (g), below, may be waived by Lender in its sole discretion but is not subject to remedy or cure by Borrower; or |
|  | (iii)  **Representations and Warranties**.  Any representation, warranty, certification, or statement of fact made or deemed made by or on behalf of Borrower herein, in any other DIP Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made (other than those representations, warranties, and certifications that are expressly qualified by Material Adverse Effect or other materiality, in which case such representations, warranties, and certifications shall be incorrect or misleading in any respect when made or deemed made); or |
|  | (iv)  **Insolvency Proceedings**. Other than the Chapter 11 Case, (i) Borrower institutes or consents to the institution of any proceeding under any Debtor Relief Law or conversion of the Chapter 11 Case to chapter 7, or makes an assignment for the benefit of creditors; (ii) applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, or similar officer is appointed without the application or consent of Borrower and the appointment continues undischarged or unstayed for sixty (60) calendar days; or (iii) any proceeding under any Debtor Relief Law relating to Borrower or to all or any material part of its property is instituted without the consent of Borrower and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or |
|  | (v)  **Judgments**. There is entered against Borrower (i) one or more final judgments or orders for the payment of money in an aggregate amount exceeding $50,000 (to the extent not covered (subject to normal deductibles) by independent third-party insurance as to which the insurer does not dispute coverage); or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case ((i) or (ii)), (A) enforcement proceedings are commenced by any creditor upon such judgment or order and such proceedings remain unstayed or undismissed for a period of thirty (30) consecutive days, or (B) there is a period of thirty (30) |

| | |
|---|---|
| **SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY** | |

| | |
|---|---|
| | consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal, the Chapter 11 Case, or otherwise, is not in effect; or |
| | (vi) **Milestones**. A Milestone under Section 6.17 is not met as of the date required to be met, unless extended or waived by the Lender in its sole discretion; or |
| | (vii) **Invalidity of DIP Documents**. Any DIP Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or on account of satisfaction in full of all the DIP Obligations, ceases to be in full force and effect; or Borrower contests in any manner the validity or enforceability of any DIP Document; or purports to revoke, terminate, or rescind any DIP Document; or |
| | (viii) **DIP Collateral**. The DIP Order after delivery thereof shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected Lien, with the priority required by the DIP Order on and security interest in any DIP Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01; or |
| | (ix) **Chapter 11 Case**. There shall have occurred any of the following in any Chapter 11 Case: |
| | (A) An order shall be entered by the Bankruptcy Court appointing, or Borrower shall file an application for an order seeking the appointment of, (a) a trustee under section 1104 of the Bankruptcy Code, or (b) an examiner or other responsible person or officer with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code; |
| | (B) An order shall be entered by the Bankruptcy Court converting the Chapter 11 Case to a chapter 7 case; |
| | (C) An order shall be entered by the Bankruptcy Court confirming a Chapter 11 Plan that does not (A) contain a provision for termination of the commitments and indefeasible payment in full in cash of all DIP Obligations of Borrower hereunder and under the other DIP Documents and the Indebtedness under the Prepetition Credit Agreement on or before the effective date of such plan or plans upon entry thereof and (B) provide for the continuation of the Liens and security interests granted to Lender hereunder until the Effective Date of such Chapter 11 Plan; |
| | (D) An order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case which does not contain a |

| | |
|---|---|
| **SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY** | |
| | provision for termination of the commitments hereunder and payment in full in cash of all DIP Obligations of Borrower hereunder and under the other DIP Documents upon entry thereof; |
| | (E)    An order shall be entered by the Bankruptcy Court without the express prior written consent of Lender to (a) revoke, reverse, stay, modify, supplement, or amend any of the DIP Orders, (b) permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to Borrower equal or superior to the priority of Lender in respect of the DIP Obligations, except for certain allowed administrative expenses, or (c) to grant or permit the grant of a Lien on the DIP Collateral, other than a Permitted Lien; |
| | (F)    An order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of Borrower with respect to any claim in an amount equal to or exceeding $50,000; |
| | (G)    An application for (a) an order impairing the DIP Collateral, the appointment of a trustee, conversion to chapter 7 or dismissal of the Chapter 11 Case shall be made (i) by a Person other than Borrower and such application is not contested by Borrower in good faith, or (ii) by Borrower; (b) an order for the use of cash collateral without the prior written consent of Lender is made; or (c) an order for the use of DIP Collateral (or the obtaining of financing or loans, secured by liens that are senior to, *pari passu* with, or junior to Lender's Liens on DIP Collateral) without the prior written consent of Lender, is made; or |
| | (H)    Borrower fails to obtain entry of an order approving the engagement of Nicholas Rubin as Debtor's Chief Restructuring Officer, on terms reasonably acceptable to Lender and consistent with the Budget, on or before January 26, 2026, or Mr. Rubin shall cease acting as an officer of Borrower following approval of his engagement. <br><br> *See* DIP Credit Agreement, § 8.01. |
| **Milestones** <br><br> Bankruptcy Rule 4001(c)(1)(B)(vi) | The Borrower shall comply with the following milestones in the Chapter 11 Case (the "Milestones"): <br><br> (a)    Borrower shall have commenced the Chapter 11 Case on December 11, 2025; <br><br> (b)    On or before December 23, 2025, the Bankruptcy Court shall have entered the Interim Order approving the Interim New Money DIP Loan and the Interim Roll-Up DIP Loan in form and |

| SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY | |
|---|---|
| | substance acceptable to Lender in its sole discretion; |
| | (c)   On or before January 28, 2026, the Bankruptcy Court shall have entered the Final Order, in form and substance acceptable to Lender in its sole discretion; |
| | (d)   On or before January 30, 2026, Borrower shall have filed a Disclosure Statement and a proposed Chapter 11 Plan, which shall provide that the Debtor emerges reorganized with Michael Johnson and Stephen Gera remaining as officers of the Reorganized Debtor and be in form and substance acceptable to Lender in its sole discretion. |
| | (e)   On or before March 6, 2026, the Bankruptcy Court shall have entered an order approving the Disclosure Statement, |
| | (f)   On or before April 13, 2026, the Bankruptcy Court shall have entered an order confirming the Debtor's Chapter 11 Plan; |
| | (g)   On or before April 15, 2026, the Effective Date shall have occurred; and |
| | (h)   On or before April 15, 2026, the Loans (to the extent not converted into Equity Interests) shall be paid in full. |
| | To the extent that any such Milestone is not satisfied due to the Bankruptcy Court not being available on the timing contemplated herein, such Milestone shall be deemed extended (with corresponding extensions of subsequent Milestones) as appropriate to resolve such conflict but in no event for more than three (3) Business Days. |
| | *See* DIP Credit Agreement, § 6.16. |
| **Roll-Up**<br><br>Local Rule 4001-2(a)(i)(O) | During the period from the entry of the Interim Order through and including the earlier to occur of (x) the entry of the Final Order or (y) the DIP Termination Date, upon each advance of Interim New Money DIP Loans, a "roll-up" of the Prepetition Secured Obligations of the Debtor under the Prepetition Credit Agreement in an amount equal to such advance.<br><br>Upon entry of the Final Order by the Court, an additional roll-up of $3,250,000,000 of the loans under the Prepetition Credit Agreement into loans under the DIP Facility shall occur.<br><br>*See* DIP Credit Agreement, § 2.01. |
| **Adequate Protection**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv) | As adequate protection for any diminution in value of the DIP Lender's interest in the Prepetition Collateral and the use of the Prepetition Collateral, including the Cash Collateral, the DIP Lender shall receive the adequate protection provided in the Interim Order, which consists of valid |

| SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY | |
|---|---|
| | and nonavoidable postpetition security interests in and liens on all of the Debtor's property and assets, whether now existing or hereafter arising and wherever located, with any such lien junior to the liens securing the DIP Obligations, the Carve-Out, and any valid, perfected, and unavoidable liens in existence as of the Petition Date. The DIP Lender will also receive a superpriority administrative claim in the Borrower's Chapter 11 Case.<br><br>*See* Interim Order at ¶ 9. |
| **Carve-Out**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Interim Order provides for a Carve-Out from the DIP Lender's collateral that includes<br><br>(i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below);<br><br>(ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code;<br><br>(iii) to the extent allowed at any time and consistent with the Budget, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtor pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and<br><br>(iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $125,000 (allocated $100,000 to the Debtor Professionals and $25,000 to the Committee Professionals) incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise.<br><br>*See* Interim Order ¶ 30. |
| **Prepayments**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(I) | Customary conditions for mandatory prepayments on facilities of this type and purpose, including but not limited to:<br><br>i. Upon the receipt by the Borrower of the Net Cash Proceeds of any Disposition or Involuntary Disposition consummated on or after the Petition Date, the Borrower shall, on or prior to the date which is three (3) Business Days after the date of the realization or receipt by the |

| SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY | |
|---|---|
| | Borrower of such Net Cash Proceeds, prepay the Loans as hereafter provided in an aggregate amount equal to 100% of the Net Cash Proceeds of such Disposition or Involuntary Disposition. |
| | ii. Upon the receipt by the Borrower after the Petition Date of the Net Cash Proceeds (x) of any Debt Issuance not permitted under Section 7.03 or (y) from the sale or issuance by the Borrower of any of its Equity Interests, in each case the Borrower shall, on or prior to the date which is three (3) Business Days after the date of the realization or receipt by the Borrower of such Net Cash Proceeds, prepay the Loans as hereafter provided in an aggregate amount equal to 100% of such Net Cash Proceeds. |
| | *See* DIP Credit Agreement, § 2.03. |
| **Repayment Features**<br><br>Bankruptcy Rule 4001-2(a)(i)(E) | Borrower must repay the DIP Loans according to the terms of the DIP Credit Agreement, with amounts due on the Final Maturity Date or Maturity Date, as applicable.<br><br>*See* DIP Credit Agreement, § 2.04. |
| **Conditions to Closing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary for financings of this type.<br><br>*See* DIP Credit Agreement, §§ 4.01, 4.02. |
| **Superpriority Expense Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve-Out in all respects, the DIP Lender is granted superpriority administrative expense claim status against each Debtor jointly and severally in the Chapter 11 Case.<br><br>*See* Interim Order, ¶ 8. |
| **Parties with an Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | Winners Alliance, Inc. |
| **Adequate Protection**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv) | The Prepetition Lender is granted adequate protection for any diminution in value of its interest in the Prepetition Collateral, including Cash Collateral, resulting from postpetition activities.<br><br>*See* Interim Order, ¶ 9. |
| **Determination Regarding Prepetition Claims** | The Interim Order contains stipulations of fact by the Debtor, including those related to the extent, validity, perfection and enforceability of the |

| SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY | |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(iii) | Prepetition Secured Obligations, subject to Challenge.<br><br>*See* Interim Order, ¶ 17. |
| **Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi) | The DIP Lender will receive a lien on avoidance actions under chapter 5 of the Bankruptcy Code and the proceeds thereof, subject to the Carve-Out, upon entry of a Final Order providing such relief.<br><br>*See* Interim Order, ¶ 6. |
| **Effect of Debtor's Stipulations on Third Parties**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | The Debtor acknowledges and agrees that as of the Petition Date, the DIP Lender's liens on the Prepetition Collateral are valid, enforceable, and perfected first-priority security interests in and continuing liens against the assets that secured the prepetition obligations and not subject to offset, deduction, claim, counterclaim, or defense of any kind, nature, or description whatsoever.<br><br>*See* Interim Order, ¶ F. |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(B) | The Debtor's stipulations shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Case and any other person or entity acting or seeking to act on behalf of the Debtor's estate, in all circumstances and for all purposes, subject only to challenge by adversary proceeding validly brought and commenced no later than 75 days after the Petition Date.<br><br>*See* Interim Order, ¶ 17. |
| **Waiver or Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The Interim Order includes a customary waiver/modification of the automatic stay to permit the Debtor to take all actions as are necessary or appropriate to implement the terms of the Interim Order. The automatic stay shall be modified to the extent necessary to permit the DIP Lender to take any action authorized by the Interim Order.<br><br>*See* DIP Credit Agreement, § 8.01; Interim Order, ¶ 14. |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit**<br><br>Bankruptcy Rule 4001(c)(1)(B)(v) | N/A |

| SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY | |
|---|---|
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The Debtor stipulates that the liens and security interests granted to the Prepetition Lender are valid, binding, enforceable, non-avoidable, and properly perfected.<br><br>The DIP Liens are valid, binding, enforceable, non-avoidable, and automatically and properly perfected.<br><br>*See* DIP Credit Agreement at §§ 5.12; 10.02; Interim Order, ¶¶ F, 7. |
| **Release, Waivers or Limitation on any Claim or Cause of Action**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | The Interim Order provides for customary releases, subject to Challenge and entry of the Final Order, if provided for therein.<br><br>*See* Interim Order, ¶ 17. |
| **Provision Limiting the Court's Power or Discretion to Enter Future Orders**<br><br>Local Rule 4001-2(a)(i)(C) | N/A |
| **506(c) Waiver; Section 552(b)**<br><br>Bankruptcy Rules 4001(c)(1)(B)(x); 4001(c)(1)(B)<br><br>Local Rules 4001 2(a)(i)(C), 4001-2(a)(i)(h) | Subject to and effective upon the entry of the DIP Order and subject to the terms of the DIP Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the Lender. Upon the entry of the DIP Order and subject to its terms, in no event shall the DIP Lender be subject to (i) surcharge under section 506(b) of the Bankruptcy Code, (ii) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code, or (iii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to DIP Lender's collateral, including, without limitation, the DIP Collateral.<br><br>*See* DIP Credit Agreement, § 5.15. |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Borrower will indemnify and defend the DIP Lender and its Related Parties (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, and related expenses (including the reasonable fees, charges, and disbursements of outside counsel for the Indemnitees, including one local counsel, as applicable, in any relevant jurisdiction and any specialty counsel, as applicable, for each relevant specialty and, in the case of actual or potential conflict of interest (as determined by such Indemnitee), |

| SUMMARY OF MATERIAL TERMS OF DIP CREDIT FACILITY | |
|---|---|
| | separate counsel for Indemnitees to the extent needed to avoid such conflict), incurred by any Indemnitee or asserted against any Indemnitee arising out of, in connection with, or as a result of, (i) the execution or delivery of the DIP Credit Agreement or any other DIP Document, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or the administration of the DIP Credit Agreement and the other DIP Documents; (ii) any DIP Loan or the use or proposed use of the proceeds therefrom; (iii) any actual or alleged release of hazardous materials at, on, under or from any property owned, leased, or operated by the Borrower, or any environmental liability related in any way to the Borrower or its properties (if any); or (iv) any actual or prospective claim, litigation, investigation, or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the actual fraud, gross negligence, bad faith, or willful misconduct of such Indemnitee. *See* DIP Credit Agreement, § 9.04; Interim Order, ¶ 28. |
| **No Marshaling** Local Rule 4001-2(a)(i)(X) | Upon the entry of the DIP Order and subject to its terms, in no event shall the Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to Lender's collateral, including, without limitation, the DIP Collateral. *See* DIP Credit Agreement, § 5.15. |

\* \* \* \*

## THE DEBTOR'S PREPETITION CAPITAL STRUCTURE

### A.    Prepetition Secured Obligations

20.    As of the Petition Date, the Debtor has approximately $5.3 million in funded debt obligations with Winners Alliance, summarized as follows:

| Winners Alliance Debt Facilities | Principal Amount Outstanding[5] |
|:---:|:---:|
| Promissory Note and Security Agreement (March 6, 2025) | $3.0 million |
| Promissory Note and Security Agreement (March 27, 2025) | $1.0 million |
| Promissory Note and Security Agreement (December 8, 2025) | $1.02 million |
| **Total Secured Debt:** | **Approx. $5.3 million** |

21.    The Debtor's secured indebtedness (the "Prepetition Secured Obligations") arises under the promissory notes and security agreements identified above (collectively, the "Prepetition Credit Agreement"). As of the Petition Date, the Debtor is indebted to the Prepetition Lender on a secured basis in an aggregate amount of approximately $5.3 million, subject to reconciliation. The obligations evidenced by the March 6, 2025 Note and the March 27, 2025 Note matured prior to the Petition Date. The December 8, 2025 Note has a stated maturity date of January 5, 2026. Pursuant to the terms of the Prepetition Credit Agreement, (i) the Prepetition Secured Obligations under March 6, 2025 Note and the March 27, 2025 Note bore interest at the "Applicable Rate" of 4.31%, while (ii) the Prepetition Secured Obligations under the December 8, 2025 Note bear

---

[5]  Amounts reflected herein are based on the Debtor's books and records as of the Petition Date and remain subject to reconciliation, including through the claims allowance process.

interest at the "Applicable Rate" of 3.66%.

22.     The Prepetition Secured Obligations are secured by substantially all of the Debtor's tangible and intangible personal property and rights, whether now owned or hereafter acquired, including, without limitation:   intellectual property and brand rights; contracts with athletes; media, sponsorship, and distribution agreements; cash; accounts; deposit accounts; general intangibles; and proceeds of the foregoing, as more fully described in the Prepetition Credit Agreement.[6]

23.     As of the Petition Date, the Debtor's assets primarily consist of intangible assets, including intellectual property, contractual rights, and goodwill associated with the "Grand Slam Track" brand, which represents the foundation of its business value. Given the lack of unencumbered assets and the Debtor's inability to obtain unsecured credit, the Debtor has no viable financing options other than the DIP Facility. The Debtor's ability to access this financing is critical to preserve the value of these intangible assets and move forward with its Chapter 11 Case.

### B.    Prepetition Unsecured Obligations

24.     In addition to the Prepetition Secured Obligations, the Prepetition Lender asserts unsecured claims against the Debtor in excess of approximately $6.1 million arising from prepetition advances, interest, fees, expenses, and other obligations.

25.     The Debtor also has significant unsecured obligations arising from its prepetition operations, consisting primarily of amounts owed to athletes, vendors, contractors, service providers, and other trade creditors. Based on the Debtor's books and records, the Debtor estimates that its unsecured obligations, exclusive of the Prepetition Lender's unsecured claims, total

---

[6] The Debtor does not own real property or other significant hard assets. Accordingly, the value of the Debtor's estate is primarily dependent on the preservation of its intellectual property, contractual relationships, connection to the Debtor's founder, Mr. Johnson, and brand goodwill.

approximately $20 million as of the Petition Date, consisting of approximately $7 million owed to athletes and approximately $13 million owed to other vendors, subject to reconciliation and exclusive of any contingent, unliquidated, or contract rejection claims.

### **ALTERNATIVE SOURCES OF FINANCING ARE NOT AVAILABLE**

26.    As discussed more fully in the Rubin Declaration, prior to the filing of this Chapter 11 Case, the Debtor faced significant financial headwinds stemming from several factors, including the substantial capital requirements associated with launching a new, global professional track and field league. Although Debtor's inaugural season was met with positive market interest and fan engagement, the Debtor's financial position was hindered by its high operating costs, including global event production, athlete compensation, and media distribution. Despite generating revenue across multiple channels, the Debtor's expenditures far exceeded its cash inflows, leaving it unable to sustain operations or fund its growth without additional capital. Moreover, the broader capital market conditions for venture and sports-media investments were increasingly conservative, further complicating the Debtor's ability to raise the necessary funds to maintain liquidity and expand operations.

27.    In the months leading up to the bankruptcy filing, the Company made significant efforts to secure additional capital and financing to address its liquidity shortfall and support its ongoing operations. These efforts included:

- o **Discussions with Existing Lenders and Investors**:  The Company engaged with the Prepetition Lender and other strategic investors to explore potential sources of additional funding. The Company had ongoing discussions with potential investors, including Eldridge Industries, which provided positive indications of investment, contingent on the successful completion of the Company's inaugural season.

- o **Capital-Raising and Strategic Outreach**: To augment its capital base, the Company retained PJT Partners ("PJT") to conduct a formal capital-raising process. Over a three-month period, from January to

March 2025, PJT contacted over 150 potential investors and facilitated extensive diligence efforts, and the Company's management participated in more than 30 live pitch meetings. Despite this broad outreach, many potential investors declined to move forward, citing concerns over the early-stage nature of the league, the absence of operating results, and the uncertainties surrounding media and sponsorship revenue.

o **Efforts to Secure Bridge Loans**:  While attempting to raise capital from new investors, the Company also sought bridge loans and short-term financing to cover immediate liquidity needs. However, these efforts were insufficient to address the Company's working capital requirements or ensure continued operations.

Despite these extensive efforts, the Debtor was unable to secure the required financing to stabilize its operations and meet its financial obligations.

28.     As part of its restructuring efforts, the Debtor explored out-of-court solutions with creditors. This included engaging in negotiations with athletes, vendors, and service providers to extend payment terms and restructure certain obligations. The Company made partial payments to athletes to maintain goodwill and preserve its athlete relationships, which were crucial to the success of the league. However, these negotiations did not result in a sustainable resolution. The Debtor's liquidity challenges continued to intensify, and the required capital infusion did not materialize in time to stabilize the business or prevent further operational strain.

29.     After exhausting all reasonable prepetition restructuring efforts and failing to secure the necessary capital, the Debtor determined that filing for chapter 11 bankruptcy protection was the most viable solution. The chapter 11 process provides the breathing room and judicial oversight necessary to restructure liabilities, preserve the Company's intellectual property and brand equity, and implement a more efficient cost structure. The Debtor's financial condition, combined with threats of an involuntary bankruptcy filing by creditors, left no alternative path to ensure the ongoing viability of the business.

## THE DEBTOR'S IMMEDIATE NEED FOR ACCESS TO THE DIP FINANCING

30.     The Debtor requires immediate access to the DIP Facility to (i) maximize the value of the estate, (ii) ensure sufficient working capital to operate its businesses and to administer its estate, and (iii) timely pay administrative expenses incurred during the Chapter 11 Case.

31.     The Debtor's inability to restructure its debt prior to the Petition Date has left it in urgent need of postpetition financing. The Debtor's liquidity is severely constrained, and the absence of new financing would prevent it from continuing operations or moving forward with a restructuring plan. The DIP Facility is crucial to provide the immediate liquidity necessary to fund ongoing operations, preserve the value of the Debtor's assets, and support the Debtor's efforts to propose a reorganization plan or explore other strategic alternatives. Without this financing, the Debtor would be forced to cease operations, resulting in irreparable harm to the estate and its stakeholders.

32.     In consultation with its advisors, the Debtor reviewed and analyzed its projected cash flows to determine the requisite amount of debtor in possession financing needed to provide ongoing working capital. Based on management's cash-flow forecast, the Debtor compiled the Budget. Based on the forecasted funding requirements reflected in the Budget, the liquidity provided under the proposed DIP Facility will enable the Debtor to preserve its value as a going concern, provide the Debtor with sufficient liquidity to meet its ongoing day-to-day obligations, fund the operational and administrative costs of the Chapter 11 Case, and satisfy working capital requirements and other operational expenses, all of which will preserve the value of the Debtor's estate for the benefit of its stakeholders.

## BASIS FOR RELIEF

I.    **THE DEBTOR SHOULD BE AUTHORIZED TO OBTAIN POSTPETITION FINANCING THROUGH THE DIP DOCUMENTS.**

    A.    **Entry into the DIP Credit Facility is an Exercise of the Debtor's Sound Business Judgment.**

33.    The Court should authorize the Debtor, as an exercise of its sound business judgment, to enter into the DIP Documents, obtain access to the proceeds of the DIP Facility, continue to use Cash Collateral (subject to the terms of the Interim Order) and grant the liens, superpriority administrative claims, and adequate protection contemplated in the DIP Credit Agreement and proposed Interim Order and, following the Final Hearing, the Final Order. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.[7]

34.    Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's

---

[7]    *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (citation omitted) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); "); *Trans World Airlines, Inc. v. Travellers Int'l AG.* (*In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). Specifically, the business judgment rule applies unless: "(1) the directors did not in fact make a decision, (2) the directors' decision was uninformed; (3) the directors were not disinterested or independent; or (4) the directors were grossly negligent." *In re In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bank. D. Del. 2011).

35.     To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at \*97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). In determining whether the Debtor has exercised sound business judgment in entering into the DIP Documents, the Court should consider the economic terms of the DIP Facility under the totality of circumstances. *See* Hr'g Tr. at 734:23-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing that "the terms that are now available for DIP financings in the current economic environment aren't as desirable" as they once were previously); *In re Ellingsen MacLean Oil Co.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization), aff'd, 834 F.2d 599 (6th Cir. 1987).

36.     Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtor offered under the proposed postpetition facility. For example, in *In re ION Media Networks, Inc.,* the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies

> and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

37.     The Debtor's entry into the DIP Facility is entitled to the deference of the business judgment rule. The Debtor and its advisors went to great lengths to ensure the decision to enter into the DIP Facility was informed and reasonable, including by seeking out-of-court restructuring options or alternative DIP financing.

38.     The Debtor's decision to enter into the DIP Facility is an appropriate exercise of its sound business judgment. As further discussed in the Rubin Declaration, the DIP Facility reflects the Debtor's operational challenges and prepetition capital structure and is the product of arms'-length, good faith negotiations and no other financing was offered or otherwise available.

39.     Keeping in mind the advantages and disadvantages of the proposed DIP Facility, the Debtor ultimately decided that moving forward with the proposed DIP Facility was appropriate and in the Debtor's best interests. Given the Debtor's current cash position and the lack of alternatives, the Debtor and its advisors determined that entry into the DIP Facility was the best path forward under the totality of the circumstances, and the Debtor believes that it has obtained the best terms available under the circumstances. The Debtor does not believe that it could secure sufficient financing in the form of unsecured credit as an administrative expense in exchange for the grant of a superpriority administrative expense claim, or without granting priming liens, and was not able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is being sought.

40.     Further, the negotiated DIP Milestones are a crucial element of the terms of the DIP Facility, and their inclusion in the DIP Credit Agreement is important to ensure that this Chapter 11 Case proceeds in a strategic, value-maximizing fashion. In similar contexts, this Court has entered interim financing orders that included express milestones for the progress of a debtor's case.[8]

41.     Given the Debtor's immediate liquidity needs to prosecute its value-maximizing Chapter 11 strategy, the Debtor believes the DIP Facility represents the best, and the only, viable source of financing available. Accordingly, the Debtor submits that entry into the DIP Facility is in the best interests of the Debtor's estate, is necessary to avoid immediate and irreparable harm, and is a reasonable exercise of the Debtor's business judgment.

**B.      The Debtor Should Be Authorized to Grant Liens and Superpriority Claims to Secure the DIP Facility.**

42.     The Debtor proposes to obtain DIP Facility by providing security interests and liens as set forth in the DIP Documents and the proposed Interim Order. The Debtor satisfies the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured debt under certain circumstances. Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or

---

[8]  *See, e.g., In re Blink Holdings, Inc.*, No. 24-11686 (JKS) (Bankr. D. Del. Aug. 13, 2024) (Docket No. 63) (approving case milestones in the interim DIP financing order); *In re Coach USA, Inc.*, No. 24-11258 (MFW) (Bankr. D. Del. Jun. 13, 2024) (Docket No. 79) (same); *In re Nanostring Technologies, Inc.*, No. 24-10160 (CTG) (Bankr. D. Del. Feb. 6, 2024) (Docket No. 75) (same); *In re Pegasus Home Fashions, Inc.*, No. 23-11235 (MFW) (Bankr. D. Del. Aug. 25, 2023) (Docket No. 34) (same); *In re Virgin Orbit Holdings, Inc.*, No. 23-10405 (KBO) (Bankr. D. Del. Apr. 5, 2023) (Docket No. 71) (same).

The referenced orders are voluminous in nature and are not attached to this Motion. However, in light of the requirements of Local Rule 7007-2(a)(vii), undersigned counsel has retained copies of each order and will make them available to the Court, if requested, or to any party that requests them.

the incurring of debt—

(1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

43.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *In re Crouse Grp.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (finding that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the d]ebtor to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

44.    Courts have articulated a three-part test to determine whether a debtor is entitled to enter into financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (*i.e.*, by allowing an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*Crouse Grp.,* 71 B.R. at 549; *see also L.A. Dodgers LLC*, 457 B.R. at 312–13; *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *Ames Dep't Stores*, 115 B.R. at 37-40.

45.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c). As described above and in the Rubin Declaration, the Debtor does not believe alternative financing is presently available on an unsecured or administrative priority only basis. Thus, the Debtor determined the DIP Facility provided the best—and, in fact, the *only*—opportunity available to the Debtor under the circumstances to fund this Chapter 11 case. Moreover, the DIP Lender is already the Prepetition Lender and is ready, willing, and able to move forward with funding promptly. Therefore, approving superpriority claims in favor of the DIP Lender is reasonable and appropriate.

C.     **The Interests of Prepetition Lender Are Adequately Protected**.

46.     Parties with an interest in collateral, including Cash Collateral, are entitled to adequate protection. *See* 11 U.S.C. § 363(e). Adequate protection may be provided in various

forms, including, among other things, payment of adequate protection, payment of interest, or granting of replacement liens or administrative claims. Thus, what constitutes adequate protection is decided on a case-by-case basis. *See, e.g.*, *Resolution Tr. Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *18 (Bankr. D. Del. Dec. 7, 2012); *In re Columbia Gas Sys., Inc.*, Nos. 91- 803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); see also In re Dynaco Corp., 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing *In re Briggs Transp. Co.*, 780 F.2d 1339 (8th Cir. 1985)) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

47.     Pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, the Debtor asserts that the Prepetition Lender, is entitled to adequate protection of its interests in all Prepetition Collateral, to the extent of any Diminution in Value of its interests in the Prepetition Collateral from and after the Petition Date, if any. The adequate protection package provided to the Prepetition Lender, as described above and set forth in the DIP Orders, is consensual and appropriately safeguards the Prepetition Lender from Diminution in Value (if any) of its interests in the Prepetition Collateral. The Debtor submits that its provision of adequate protection to the Prepetition Lender is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code. The Prepetition Lender does not object to the adequacy of the proposed adequate protection at this time, but reserves rights to seek additional adequate protection should the current package prove insufficient.

**D.      The Proposed Roll-Up Is Appropriate**.

48.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound

business purpose. *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction). The business judgment rule shields a debtor's management from judicial second-guessing. *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

49.     Repaying prepetition debt with funds borrowed postpetition (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements. Indeed, most DIP loans in Delaware involve roll-ups or creeping roll ups, and the importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein.[9]

50.     For example, as Judge Sontchi stated in *In re Capmark Financial Group Inc.*,

---

[9] *See, e.g., In re Franchise Group, Inc.*, No. 24-12480 (JTD) (Bankr. D. Del. Dec. 11, 2024) (Docket No. 414) (approving a $750 million DIP Credit Facility with a 2:1 ratio consisting of $500 million of prepetition debt and $250 million of new money); *In re Restoration Forest Prods. Grp.*, No. 24-10120 (KBO) (Bankr. D. Del. Feb. 1, 2024) (Docket No. 44) (authorizing an approximately $93 million DIP Credit Facility, including a $64 million roll-up of the prepetition bridge facility on an interim basis); *In re DeCurtis Holdings LLC*, No. 23- 10548 (JKS) (Bankr. D. Del. June 23, 2023) (Docket No. 285) (authorizing an approximate $27 million DIP Credit Facility, including a $20.5 million roll-up of prepetition loans); *In re SiO2 Medical Prods., Inc*., No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (Docket No. 216) (authorizing an approximately $120 million DIP Credit Facility, including a $60 million roll-up of the prepetition term loan); *In re Phoenix Servs. Topco LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) (Docket No. 73) (approving a $100 million interim DIP Credit Facility with a 3:1 roll-up ratio consisting of $75 million of prepetition debt and $25 million of new money); *In re TPC Grp.*, No. 22- 10493 (CTG) (Bankr. D. Del. June 3, 2022) (Docket No. 147) (authorizing an approximately $323 million DIP Credit Facility, including a $238 million roll-up of prepetition secured notes, of which approximately $59 million rolled up on an interim basis); *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW) (Bankr. D. Del. Mar. 17, 2021) (Docket No. 100) (approving a $13 million interim DIP Credit Facility with a 3:1 ratio consisting of $39 million of prepetition debt and $13 million of new money); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. July 23, 2019) (Docket No. 81) (authorizing DIP facilities in the aggregate amount of $240 million, including a $100 million roll-up of the prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim order); *In re Charlotte Russe Holding, Inc*., No. 19-10210 (LSS) (Bankr. D. Del. Feb. 5, 2019) (Docket No. 92) (approving a $50 million interim DIP Credit Facility with a 2.57:1 roll-up ratio consisting of $36 million of prepetition debt and $14 million of new money).

438 B.R. 471 (Bankr. D. Del. 2010) (CSS):

> [P]repetition secured claims can be paid off through a "roll-up." Most simply, a [roll-up] is the payment of a pre-petition debt with the proceeds of a post-petition loan. Roll-ups most commonly arise where a pre-petition secured creditor is also providing a post-petition DIP loan under section 364(c) and/or (d) of the Bankruptcy Code. The proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money being lent to the debtor. As a result, the entirety of the pre-petition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order. In both a refinancing and a roll-up, the pre-petition secured claim is paid through the issuance of new debt rather than from unencumbered cash.

*Id*. at 511 (footnotes omitted). Judge Sontchi recognized that, in a roll-up, "actual money rarely changes hands. The pre-petition loan is deemed satisfied and the post-petition loan includes the amount of the pre-petition debt." *Id*. at 511 n.14. As Judge Sontchi further stated in *Capmark*:

> A "creeping roll-up" is identical to a roll-up except that the payment of the pre-petition debt occurs over time. Creeping roll-ups are most commonly used with revolving lines of credit or "revolvers." In a typical revolver, the debtor has a zero-balance account. As payments are received by the debtor from third parties they are deposited in an account with the lender and applied, usually daily, to reduce the debt. As payments are made by the debtor to third parties the debt increases. Thus, the amount of the debt rises and falls on an almost daily basis. In a creeping roll-up, payments received post-petition by the debtor are used to reduce the pre-petition debt. In addition, the debtor's post-petition payments to third parties serve to increase the post-petition debt. Thus, the pre-petition revolver is gradually "paid off" and replaced with the post-petition revolver—often before the final DIP hearing. Again, actual money rarely changes hands.

*Id*. at 511 n.15; *see also Simon & Schuster, Inc. v. Advanced Mktg. Servs. (In re Advanced Mktg. Servs.)*, 360 B.R. 421, 423 (Bankr. D. Del. 2007) (discussing "creeping roll up" approved as part of interim relief and stating that the DIP Loan Agreement "contemplates the Debtors' satisfaction of their pre-petition obligations to the Senior Lenders through application of Cash Collateral (as defined in the Interim Order), which is derived primarily from the proceeds from the sale of the Debtors' inventory, all before payment of Debtors' post-petition obligations under the

DIP Loan.").

51.     As set forth above, the DIP Documents provide that the DIP Facility will be used to roll up, subject to entry of the Final Order, a portion of the Prepetition Secured Obligations. This repayment is a sound exercise of the Debtor's business judgment and is a material component of the structure of the DIP Facility. Without continued access to the additional liquidity provided under the DIP Facility, the Debtor will be unable to fund the administration of this Chapter 11 Case.

52.     As discussed in the Rubin Declaration, the Rolled-Up DIP Loans were the subject of arms'-length, good faith negotiations between the Debtor and the DIP Lender, is an integral component of the overall terms of the DIP Facility, and is subject to the Carve-Out. Additionally, the Rolled-Up DIP Loans were a necessary and integral condition for the DIP Lender to agree to the DIP Facility. For these reasons and because no other party has put forward an actionable financing proposal, the Rolled-Up DIP Loans are reasonable, appropriate, a sound exercise of the Debtor's business judgment, and ultimately in the best interests of all stakeholders given the alternatives.

**E.     The Carve-Out is Appropriate**.

53.     The liens granted pursuant to the DIP Facility, adequate protection claims, and the superpriority claims of the Prepetition Lender and the DIP Lender are subject and subordinate to the Carve-Out. The Carve-Out contains similar terms to others that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.[10]

---

[10] *See, e.g.*, *In re Cano Health, Inc.*, No. 24-10164 (KBO) (Bankr. D. Del. Mar. 6, 2023) (Docket No. 271); *In re Sunlight Fin. Holdings, Inc.*, No. 23-11794 (MFW) (Bankr. D. Del. Nov. 30, 2023) (Docket No. 169); *In re Western Glob. Airlines, Inc.*, No. 23-11093 (KBO) (Bankr. D. Del. Sept. 12, 2023) (Docket No. 236); *In re Brooks Brothers Grp.*, No. 20-11785 (CSS) (Bankr. D. Del. Aug. 14, 2020) (Docket No. 443); *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. May 21, 2020) (Docket No. 123); *In re Claire's Stores, Inc.*, No. 18-10584

54.     Without the Carve-Out, the Debtor's estate may be deprived of possible rights and powers if the services for which professionals may be compensated are restricted. *See Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of this Chapter 11 Case by the funding of reserves to ensure that assets remain for the payment of U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority claims and replacement liens as part of the adequate protection of the Prepetition Lender's interests in the Prepetition Collateral and the funding of a reserve.

### F.     The Debtor Has Exercised Its Business Judgment in Entering Into the DIP Facility and Satisfies the Heightened Scrutiny Required for an Insider.

55.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is generally governed by the business judgment standard. *See Ames Dep't Stores* at 40 ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. at 974 (noting that the interim loan,

---

(MFW) (Bankr. D. Del. March 20, 2018) (Docket No. 130); *Ames Dep't Stores*, 115 B.R. at 40–41; *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. Aug. 19, 2016) (Docket No. 130); *In re Am. Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Nov. 2, 2015) (Docket No. 248); *In re Reichold Holdings US, Inc.*, No. 14-12237 (MFW) (Bankr. D. Del. Oct. 2, 2014) (Docket No. 54).

receivable facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interests of [the debtor] and its creditors.").

56.     However, when a transaction is between a debtor and its insider, "courts apply a 'heightened scrutiny' test in assessing the bona fides of a transaction among a debtor and an insider of the debtor." *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (citation omitted). "A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) (*quoting Fabricators Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991)).

57.     In seeking to enter into the DIP Facility, the Debtor has not only exercised sound business judgment but has also satisfied the heightened scrutiny test for entering into transactions with insiders. The former chair of the Debtor's board of directors, who owns a material amount of the equity of the DIP Lender (which, in turn, is an equity interest holder of the Debtor), recused himself from negotiating and voting on approval of the DIP Facility. Indeed, the former chair (and another member of the Debtor's board of directors with connections to the DIP Lender) resigned prior to the Petition Date. As set forth in the Rubin Declaration, the Debtor's CRO was actively involved in negotiating the DIP Facility with the DIP Lender. Those negotiations were conducted at arm's length and in good faith and included multiple iterations of the Budget and the Carve-Out to ensure appropriate protections for the estate and its stakeholders. Moreover, while the DIP Lender is affiliated with the Debtor, each of the parties have separate counsel that assisted their respective clients in connection with negotiating the DIP Facility and the Debtor's CRO independently engaged in efforts to identify alternative financing options (as discussed further

below).

58.    The use of its current cash reserves and reliance on business operations is insufficient to meet the Debtor's working capital needs to operate its business in the ordinary course and simultaneously navigate, and emerge from, the Chapter 11 Case. As detailed in the Rubin Declaration, there is an urgent need for DIP Facility because the Debtor's current finances are insufficient to allow the Debtor to continue to operate its business and meet its obligations in the Chapter 11 Case.

59.    Further, in an effort to secure alternative sources of postpetition financing, the Debtor solicited proposals from eleven (11) potential lenders, including distressed investors and alternative financing sources. However, despite these extensive efforts, the Debtor received only a single proposal from the DIP Lender. The terms of this proposal were subject to rigorous negotiation, and the Debtor, in consultation with its advisors, has concluded that the proposed DIP Facility is the only viable option to secure the necessary liquidity to preserve the value of the estate and continue operations. Therefore, following reasoned business judgment, it is clear the DIP Facility is the best offer obtainable under the circumstances.

60.    The Debtor engaged in arm's length negotiations with the DIP Lender and further improved the terms of the DIP Facility. The DIP Credit Agreement contains terms and conditions that are the best available and provides the Debtor with sufficient liquidity to effectively operate the Debtor's business through the Chapter 11 Case and make necessary administrative payments. This Court has previously approved similar debtor-in-possession financing agreements where the debtor was not able to obtain postpetition financing under other conditions.[11]

---

[11] *See, e.g.*, *In re BLH Topco LLC*, No. 25-10576 (CTG) (Bankr. D. Del. Apr. 24, 2025) (Docket No. 129) *In re Brightmark Plastics Renewal LLC*, No. 25-10472 (LSS) (Bankr. D. Del. Apr. 22, 2025) (Docket No. 152); *In re Viridos, Inc.*, No. 25-10697 (CTG) (Bankr. D. Del. Apr. 15, 2025) (Docket No. 16); *In re Smallhold, Inc.*, No. 24-10267 (CTG) (Bankr. D. Del. Apr. 17, 2024) (Docket No. 129).

61.     The funds provided by the DIP Facility are essential to enable the Debtor to continue to operate during the course of this Chapter 11 Case and allow it to emerge from bankruptcy. Indeed, failure to obtain approval of the DIP Facility would potentially lead to a wind-down of the Debtor's business operations which, in turn, would adversely affect its creditors and the estate.

62.     Accordingly, pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtor respectfully submits that it should be granted authority to obtain financing from the DIP Lender on the terms set forth in the DIP Credit Agreement.

### G.     The DIP Lender Should Be Deemed a Good Faith Lender.

63.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or the grant of such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

64.     Here, the Debtor believes the DIP Facility embodies the most favorable terms on which the Debtor could obtain postpetition financing. As described in the Rubin Declaration, all negotiations of the DIP Documents with the DIP Lender were conducted in good faith and at arm's length. The terms and conditions of the DIP Documents are entirely fair under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Documents and in accordance

with the Budget (subject to Permitted Variances). Further, no consideration is being provided to any party to the DIP Documents other than as described herein and in the Rubin Declaration. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lender thus is entitled to all of the protections afforded by that section.

## II.    THE USE OF CASH COLLATERAL IS APPROPRIATE

65.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2) provides that:

> The trustee may not use, sell or lease cash collateral . . . unless—(A) each entity that has an interest in such collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2). Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

66.    The Debtor requires the use of Cash Collateral to obtain services that are necessary to its business. Although the use of Cash Collateral alone is insufficient to satisfy the Debtor's ongoing funding requirements for its business and the administration of this Chapter 11 Case and consequently needs to supplement with the funds provided by the DIP Facility, it is imperative that the Debtor obtain authority to use Cash Collateral, subject to the terms described herein and provided for in the Interim Order. Accordingly, to obtain the necessary financing, and to avoid immediate and irreparable harm to its business and estate, the Debtor has an immediate need for authority to use the Cash Collateral as set forth in the DIP Orders.

67.    During this Chapter 11 Case, the Debtor will need access to its Cash Collateral to

make payments that are essential for the operation of the Debtor's business, including, without limitation, payments coming due pos-petition with respect to certain insurance policies and employee wages. An inability to use such funds during this Chapter 11 Case could severely impact the success of this Chapter 11 Case. Indeed, without access to Cash Collateral, the Debtor and its estate will suffer immediate and irreparable harm.

68.     The Debtor has satisfied the requirements of sections 363(c)(2) and (e) and should be authorized to use Cash Collateral. As noted above, the Debtor intends to provide the Prepetition Lender with adequate protection for the use of Cash Collateral that constitutes Prepetition Collateral. Mitigating any potential operational damage from a consensual Cash Collateral agreement will prevent avoidable Diminution in Value of the Cash Collateral and enhance the likelihood of preserving the Debtor's overall value. *See, e.g., 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

69.     The Prepetition Lender has consented to the Debtor's use of Cash Collateral. This satisfies the Bankruptcy Code's requirement for a priming lien with respect to the Prepetition Lender. Accordingly, the Court should grant the Debtor the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

## III.    MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED.

70.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtor to, among other things, (i) grant the security interests, liens, and superpriority

claims described above with respect to the DIP Lender and the Prepetition Lender, as applicable, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the Debtor to incur all liabilities and obligations to the DIP Lender and the Prepetition Lender under the DIP Documents, the DIP Facility, and the Interim Order, as applicable; and (iii) authorize the Debtor to pay, and the DIP Lender and the Prepetition Lender to retain and apply, payments made in accordance with the terms of the Interim Order and the DIP Documents.

71.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities, and under the present circumstances, are well within the Debtor's reasonable business judgment and entirely fair.[12]

## IV.    THE DEBTOR REQUIRES IMMEDIATE ACCESS TO DIP FINANCING.

72.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2)(A), (c)(2)(A). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 38, 40.

73.     As of the Petition Date, the Debtor has approximately $143,000 in cash on hand,

---

[12] *See, e.g., In re Cano Health, Inc.*, No. 24-10164 (KBO) (Bankr. D. Del. Mar. 6, 2023) (Docket No. 271); *In re Sunlight Fin. Holdings, Inc.*, No. 23-11794 (MFW) (Bankr. D. Del. Nov. 30, 2023) (Docket No. 169); *In re Western Glob. Airlines, Inc.*, No. 23-11093 (KBO) (Bankr. D. Del. Sept. 12, 2023) (Docket No. 236); *In re Brooks Brothers Grp.*, No. 20-11785 (CSS) (Bankr. D. Del. Aug. 14, 2020) (Docket No. 443); *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. May 21, 2020) (Docket No. 123); *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. Jan. 17, 2019) (Docket No. 222); *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Oct. 9, 2018) (Docket No. 184); *In re NORDAM Grp., Inc.*, No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018) (Docket No. 85); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018) (Docket No. 130); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 13, 2017) (Docket No. 93).

all of which constitutes Cash Collateral of the Prepetition Lender and is to be paid to the Prepetition

Lender. In any event, even if use of Cash Collateral were consented to by the Prepetition Lender,

it is not in sufficient amount to fund the estate and would be exhausted within the first weeks of

this Chapter 11 Case. Absent authority to enter into and to access the proceeds of the DIP Facility,

even for a limited period of time, the Debtor will be unable to continue operating its businesses,

resulting in a deterioration of value and immediate and irreparable harm to the Debtor's estate.

Thus, the Debtor requires immediate access to the proceeds of the DIP Facility, as well as authority

to use Cash Collateral, to finance its operations and continue operating as a going concern during

the pendency of this Chapter 11 Case.

## REQUEST FOR A FINAL HEARING

74.     The Court may grant interim relief in respect of a motion filed pursuant to section

364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and

irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2)(A), (c)(2)(A).

The Debtor respectfully requests a date which is no later than thirty (30) days after entry of the

Interim Order, to hold a hearing to consider entry of a Final Order and the final approval of the

relief requested in this Motion.

## BANKRUPTCY RULE 6003(b) HAS BEEN SATISFIED

75.     Bankruptcy Rule 6003(b) provides that, " [u]nless relief is needed to avoid

immediate and irreparable harm, the court must not, within 21 days after the petition is filed,

grant . . . a motion to pay all or a part of a claim that arose before the petition was filed."

Fed R. Bankr. P. 6003(a)(2).  Immediate and irreparable harm exists where the absence of relief

would impair a debtor's ability to maximize value or threaten the debtor's future as a going

concern.  *See, e.g.*, *In re Bayou Steel BD Holdings, L.L.C.,* No. 19-12153 (KBO) (Bankr. D. Del.

Oct. 3, 2019), (Docket No. 46) (providing that debtors satisfied the requirements of Bankruptcy

Rule 6003(b)); *see also In re Genco Shipping & Trading Ltd.,* 509 B.R. 455, 469 (Bankr. S.D.N.Y. 2014) (finding that the debtors would suffer "immediate and irreparable harm" without the assumption of a restructuring support agreement and the use of cash collateral).

76.     For the reasons discussed above, the Debtor believes an immediate and orderly transition into chapter 11 is critical, and the failure to receive the requested relief during the first twenty-one (21) days of this Chapter 11 Case could impact the Debtor's operations at this important juncture. As described in this Motion and in the Rubin Declaration, the Debtor would suffer immediate and irreparable harm if the relief sought herein were not promptly granted and if the Debtor was therefore unable to access the proceeds of the DIP Facility or use Cash Collateral. Based on the foregoing, the Debtor submits that the relief requested in this Motion is necessary to avoid immediate and irreparable harm, and therefore, Bankruptcy Rule 6003(b) is satisfied.

### **REQUEST FOR BANKRUPTCY RULES 6004(a) AND (h) WAIVERS**

77.     To implement the foregoing successfully, and given the emergent nature of the relief requested in this Motion, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the Rubin Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply. The Debtor further submits that waiver is appropriate as part of any Final Order, because the incremental funding that will be made available will be necessary to avoid immediate and irreparable harm at such time.

## RESERVATION OF RIGHTS

78.     Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as:  (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or non-bankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtor's or any party in interest's rights to subsequently dispute such claim.

## NOTICE

79.     Notice of this Motion has been provided by email, facsimile, or overnight courier to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the twenty (20) largest unsecured claims against the Debtor (excluding insiders); (iii) counsel to the Prepetition Lender and the DIP Lender; and (iv) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two (2) business days of the hearing on this Motion, the Debtor will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule

9013-1(m). The Debtor submits that in light of the nature of the relief requested, no other or further notice is necessary.

## NO PRIOR REQUEST

80.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

**WHEREFORE,** the Debtor respectfully requests entry of interim and final orders, substantially in the forms of the Interim Order filed with this Motion and the Final Order, granting the relief requested herein and granting such other relief as is appropriate.

Dated: December 21, 2025,               Respectfully submitted,
       Wilmington, Delaware

                                              **REED SMITH LLP**

          By:     */s/ Jason D. Angelo*
                    Kurt F. Gwynne (No. 3951)
                    Jason D. Angelo (No. 6009)
                    Gabrielle A. Colson (No. 7179)
                    1201 North Market Street, Suite 1500
                    Wilmington, DE 19801
                    Telephone: (302) 778-7500
                    Facsimile:  (302) 778-7575
                    Email: kgwynne@reedsmith.com
                    Email: jangelo@reedsmith.com
                    Email: gcolson@reedsmith.com

                    - and -

                    David B. Golubchik, Esq. (admitted *pro hac vice*)
                    Krikor J. Meshefejian, Esq. (admitted *pro hac vice*)
                    **LEVENE, NEALE, BENDER, YOO &**
                    **GOLUBCHIK L.L.P.**
                    2818 La Cienega Avenue
                    Los Angeles, CA 90034
                    Telephone: (310) 229-1234
                    Facsimile:  (310) 229-1244
                    Email: dbg@lnbyg.com
                    Email: kjm@lnbyg.com

                    *Proposed Counsel for the Debtor and*
                    *Debtor in Possession*