```
THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN
             APPROVED FOR SOLICITATION PURPOSES
```

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GST, INC.,[1] | ) | Case No. 25-12188 (KBO) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## COMBINED DISCLOSURE STATEMENT
## AND CHAPTER 11 PLAN OF REORGANIZATION OF GST, INC.

**REED SMITH LLP**
Jason D. Angelo (No. 6009)
Matthew P. Milana (No. 6681)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile:  (302) 778-7575
Email: jangelo@reedsmith.com
Email: mmilana@reedsmith.com

**LEVENE, NEALE, BENDER,**
**YOO & GOLUBCHIK L.L.P.**
David B. Golubchik, Esq. (admitted *pro hac vice*)
Krikor J. Meshefejian, Esq. (admitted *pro hac vice*)
2818 La Cienega Avenue
Los Angeles, CA 90034
Telephone: (310) 229-1234
Facsimile:  (310) 229-1244
Email: dbg@lnbyg.com
Email: kjm@lnbyg.com

*Counsel for the Debtor and Debtor in Possession*

---

[1] The last four digits of the Debtor's taxpayer identification number are 1002.  The Debtor's corporate headquarters and service address is 322 Culver Boulevard, Suite 150, Playa Del Rey, CA 90293.

# TABLE OF CONTENTS

**ARTICLE I**     **INTRODUCTION** .................................................................................... 1

    A.    Disclaimers ...................................................................................................... 1
    B.    Introduction to the Combined Disclosure Statement and Plan ......................... 2
    C.    Debtor's Recommendation ............................................................................... 3

**ARTICLE II**     **DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW** ............................................................ 3

    A.    Defined Terms ................................................................................................. 3
    B.    Computation of Time ..................................................................................... 10
    C.    Governing Law .............................................................................................. 10
    D.    Controlling Document .................................................................................... 10
    E.    Exhibits ......................................................................................................... 11

**ARTICLE III**     **CASE BACKGROUND AND DISCLOSURES** ................................. 11

    A.    Founding of GST ........................................................................................... 11
    B.    The Grand Slam Track Concept ..................................................................... 11
    C.    Early Development and Strategic Engagements .............................................. 12
    D.    Initial Capitalization and Public Launch ....................................................... 12
    E.    Prepetition Financing Efforts ......................................................................... 13
    F.    Basis for Early Backing by Investors ............................................................. 14
    G.    Events Leading to the Filing of the Chapter 11 Case ..................................... 15
        1.    Execution of the Inaugural 2025 Season Amid Ongoing Financing Efforts .............. 15
        2.    Structural Drivers of the Company's Financial Stress ............................. 16
        3.    Liquidity Preservation and Creditor Pressure ......................................... 17
        4.    Evaluation of Strategic Alternatives and Benefits of Chapter 11 ............. 17
    H.    Assets and Capital Structure .......................................................................... 18
    I.    The Debtor's Chapter 11 Case ....................................................................... 20
        1.    Motion To Approve the DIP Loan Agreement and DIP Obligations ......... 20
        2.    Application to Appoint Stretto, Inc. as Claims/Noticing Agent ............... 20
        3.    Motion Authorizing the Debtor to Redact Certain Personal Identification Information ....................................................................... 20
        4.    Motion to Extend Deadline to File Schedules or Provide Required Information ...... 20
        5.    Motion Authorizing Debtor to Retain Force 10 to Provide Nicholas Rubin as CRO and Additional Personnel, and Related Relief ................... 21
        6.    Application of Debtor to Employ Levene, Neale, Bender, Yoo & Golubchik L.L.P. as Lead Bankruptcy Counsel .................................... 21
        7.    Application of Debtor to Employ Reed Smith LLP as Co-Counsel ......... 21
        8.    Potential Motion (I) for Entry of an Order Approving Sale Timeline, Bidding Procedures and Related Relief and (II) for Entry of an Order Approving the Debtor's Sale of all or Substantially all of the Debtor's Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases ...................... 22

**ARTICLE IV**     **DIP OBLIGATIONS, ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS** ......................................................................................... 22

    A.    DIP Obligations ............................................................................................. 22
    B.    Administrative Claims .................................................................................... 22
    C.    Priority Tax Claims ........................................................................................ 23

**ARTICLE V**     **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ................. 23

    A.    Classification of Claims and Interests ............................................................ 23
    B.    Treatment of Claims and Interests ................................................................. 24
        1.    Class 1 – Prepetition Secured Claims ..................................................... 25

|  |  |  |  |
|---|---|---|---|
|  | 2. | Class 2 – Priority Non-Tax Claims | 25 |
|  | 3. | Class 3A – Critical Athlete Claims | 25 |
|  | 4. | Class 3B – Critical Vendor Claims | 26 |
|  | 5. | Class 3C – General Unsecured Claims | 27 |
|  | 6. | Class 4 – Interests | 27 |
| C. | | Special Provision Governing Unimpaired Claims | 27 |
| D. | | Subordinated Claims | 27 |
| E. | | Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes | 28 |
| F. | | Nonconsensual Confirmation | 28 |
| G. | | Acceptance or Rejection of the Plan | 28 |
|  | 1. | Voting Classes | 28 |
|  | 2. | Presumed Acceptance of the Plan | 28 |
|  | 3. | Presumed Rejection of the Plan | 28 |
| H. | | Controversy Concerning Impairment | 28 |
| I. | | No Waiver | 28 |

**ARTICLE VI    CONFIRMATION AND VOTING PROCEDURES** .......................................................... 29

| A. | Confirmation Procedures | 29 |
|---|---|---|
| B. | Procedure for Objections | 29 |
| C. | Requirements for Confirmation | 29 |
| D. | Classification of Claims and Interests | 29 |
| E. | Impaired Claims or Interests | 30 |
| F. | Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code | 31 |
| G. | Feasibility | 31 |
| H. | Best Interests Test and Liquidation Analysis | 31 |

**ARTICLE VII    MEANS FOR IMPLEMENTATION OF THE PLAN** ........................................................ 32

| A. | Funding for the Plan | 32 |
|---|---|---|
| B. | Composition of the Reorganized Debtor | 32 |
| C. | Appointment of Plan Administrator | 32 |
| D. | Employment of Employees and Professionals by Plan Administrator | 32 |
| E. | Compensation of Plan Administrator | 33 |
| F. | Creation of Reserves and Distribution of Cash | 33 |
| G. | No Action Against Plan Administrator Without Bankruptcy Court Approval | 33 |
| H. | Termination of the Estate and the Role of the Plan Administrator | 33 |
| I. | No Recourse Against the Plan Administrator | 33 |
| J. | Disbursing Agent | 33 |
| K. | Non-Waiver of Privilege | 34 |
| L. | Cancellation of Securities and Agreements | 34 |
| M. | Corporate Action | 34 |
| N. | Effectuating Documents; Further Transactions | 34 |
| O. | Section 1145 Exemption | 35 |
| P. | Section 1146 Exemption | 35 |
| Q. | Estate Claims and Causes of Action Preserved and Revested in Reorganized Debtor | 35 |
| R. | Health and Benefit Plans of the Debtor and Reorganized Debtor | 36 |
| S. | Closing the Chapter 11 Case | 36 |

**ARTICLE VIII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ............ 36

| A. | Rejection of Executory Contracts and Unexpired Leases | 36 |
|---|---|---|
| B. | Insurance Policies | 37 |
| C. | Indemnification Obligations | 38 |
| D. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 38 |
| E. | Preexisting Obligations to the Debtor under Executory Contracts and Unexpired Leases | 38 |
| F. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 39 |
| G. | Reservation of Rights | 39 |

**ARTICLE IX    CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING** ................. 39

|       |    |                                                                                      |     |
|-------|----|--------------------------------------------------------------------------------------|-----|
|       | A. | The Plan May Not Be Accepted.........................................................| 39  |
|       | B. | The Plan May Not Be Confirmed ......................................................| 39  |
|       | C. | Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections...........................................................| 40  |
|       | D. | Objections to Classification of Claims .............................................| 40  |
|       | E. | Failure to Consummate the Plan ......................................................| 41  |
|       | F. | Debtor Release or Injunction Provisions May Not Be Approved ...........| 41  |
|       | G. | Certain Tax Considerations ..............................................................| 41  |

**ARTICLE X    MANNER OF DISTRIBUTIONS UNDER THE PLAN** ......... 43

|       |    |                                                                                      |     |
|-------|----|--------------------------------------------------------------------------------------|-----|
|       | A. | Objections to Claims .........................................................................| 43  |
|       |    | 1.   Authority to Object to, and to Compromise, Claims ..................| 43  |
|       |    | 2.   Disallowance of Certain Scheduled Claims..............................| 43  |
|       |    | 3.   Estimation of Claims ................................................................| 43  |
|       |    | 4.   Retention of Jurisdiction to Determine Allowance of Claims After the Effective Date..................................................| 43  |
|       | B. | Delivery Upon Resolution of Disputed Claims.................................| 43  |
|       | C. | *De Minimus* Cash Distributions.....................................................| 44  |
|       | D. | Final Distribution ............................................................................| 44  |
|       | E. | Delivery of Distributions .................................................................| 44  |
|       | F. | Undeliverable Distributions and Unclaimed Property .......................| 44  |
|       | G. | Fractional Cents ...............................................................................| 45  |
|       | H. | Forfeiture of Distribution ................................................................| 45  |
|       | I. | Further Distributions Not Feasible .................................................| 45  |
|       | J. | Manner of Payment Pursuant to the Plan ........................................| 45  |
|       | K. | Compliance with Tax Requirements ................................................| 45  |
|       | L. | Allocations .......................................................................................| 46  |
|       | M. | No Postpetition Interest on Claims..................................................| 46  |

**ARTICLE XI    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS** .............. 46

|       |    |                                                                                      |     |
|-------|----|--------------------------------------------------------------------------------------|-----|
|       | A. | Termination of Claims and Interests ...............................................| 46  |
|       | B. | Release of Liens ..............................................................................| 47  |
|       | C. | Releases by the Debtor.....................................................................| 47  |
|       | D. | Exculpation .......................................................................................| 48  |
|       | E. | Injunction .........................................................................................| 48  |
|       | F. | Protections Against Discriminatory Treatment................................| 48  |
|       | G. | Term of Injunctions or Stays...........................................................| 49  |

**ARTICLE XII    CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**........................ 49

|       |    |                                                                                      |     |
|-------|----|--------------------------------------------------------------------------------------|-----|
|       | A. | Conditions Precedent to the Effective Date ....................................| 49  |
|       | B. | Waiver of Conditions........................................................................| 49  |
|       | C. | Effect of Failure of Conditions ......................................................| 49  |

**ARTICLE XIII    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN** .................. 50

|       |    |                                                                                      |     |
|-------|----|--------------------------------------------------------------------------------------|-----|
|       | A. | Modification and Amendments.........................................................| 50  |

**ARTICLE XIV    RETENTION OF JURISDICTION** ................................................... 50

**ARTICLE XV    MISCELLANEOUS PROVISIONS**................................................... 51

|       |    |                                                                                      |     |
|-------|----|--------------------------------------------------------------------------------------|-----|
|       | A. | Discharge ..........................................................................................| 51  |
|       | B. | Immediate Effect..............................................................................| 51  |
|       | C. | Additional Documents .....................................................................| 52  |
|       | D. | Successors and Assigns....................................................................| 52  |
|       | E. | Dissolution of the Committee .........................................................| 52  |
|       | F. | Notices .............................................................................................| 52  |

G.      Entire Agreement .......................................................................................................... 53
H.      Non-Severability of Plan Provisions ........................................................................... 53
I.       Votes Solicited in Good Faith ...................................................................................... 53
J.       Post-Effective Date Limitation of Notice.................................................................... 53
K.      Inconsistency................................................................................................................. 53
L.      Closing of Chapter 11 Case.......................................................................................... 54

**THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS SUBJECT TO CHANGE.**

## ARTICLE I

## INTRODUCTION

GST, Inc. ("GST" or the "Company" or the "Debtor") is the debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), under case no. 25-12188, pending before the Honorable Karen B. Owens in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

On December 11, 2025 (the "Petition Date"), the Debtor commenced this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor is operating its business and managing its financial affairs as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtor proposes this *Combined Disclosure Statement and Chapter 11 Plan of Reorganization of GST, Inc.* (as may be revised, amended, or modified from time to time, the "Combined Disclosure Statement and Plan" or the "Plan" or "Disclosure Statement", as applicable) pursuant to sections 1121(a) and 1125(b) of the Bankruptcy Code.

A.     **Disclaimers**

This Combined Disclosure Statement and Plan describes certain statutory provisions, events in the Chapter 11 Case, and the proposed terms of and certain documents related to the Combined Disclosure Statement and Plan and that may be attached and are incorporated by reference.  Although the Debtor believes that the information set forth herein is fair and accurate, the summaries set forth herein are qualified in their entirety by the specific provisions of the Bankruptcy Code and the underlying documents being summarized.

The information contained herein or attached hereto is made only as of the date of this Combined Disclosure Statement and Plan unless another time is specified.  No representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtor's business.  Except where specifically noted, the financial information contained in this Combined Disclosure Statement and Plan and in the related exhibit has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction.

This Combined Disclosure Statement and Plan has been prepared in accordance with sections 1123 and 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not in accordance with federal or state securities laws or other non-bankruptcy laws.  The Debtor is proposing the Combined Disclosure Statement and Plan pursuant to sections 1125 and 1129 of the Bankruptcy Code.  The Debtor is the proponent of the Combined Disclosure Statement and Plan within the meaning of section 1129 of the Bankruptcy Code and will ask the Bankruptcy Court to approve this Combined Disclosure Statement and Plan.

Nothing stated herein shall be deemed or construed as an admission of any fact or liability by any party or be admissible in any proceeding involving the Debtor or any other party or be deemed conclusive evidence of the tax or other legal effects of the Combined Disclosure Statement and Plan. Certain statements contained herein, by nature, are forward-looking and contain estimates and assumptions. **There can be no assurance that such statements, including estimated potential recoveries of claimants, will reflect actual outcomes.**

This Combined Disclosure Statement and Plan should not be construed as providing any legal, business, financial or tax advice. Therefore, each holder of a claim or interest should consult with its own legal, business, financial and tax advisors as to any such matters concerning the Combined Disclosure Statement and Plan and the transactions contemplated hereby.

## B.    **Introduction to the Combined Disclosure Statement and Plan**

Chapter 11 of the Bankruptcy Code allows a debtor to propose a plan of reorganization. A plan of reorganization may provide for a debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Plan proposed by the Debtor is a reorganization plan. After confirmation of the Plan, the Debtor shall be referred to as the "Reorganized Debtor."

The Debtor has insufficient assets to provide recoveries to its creditors and acknowledges that unfortunate reality and the burden on its creditors. Nevertheless, as forecasted by the Debtor, the Debtor has been negotiating with interested parties to provide the Debtor with funding in order to give some recoveries to its creditors and put its creditors in a better position than they would be in under a liquidation of the Debtor. To that end, the Plan provides for the continuation of the Debtor's operations through the Reorganized Debtor[2] through a transaction whereby an entity to be formed and owned and controlled at least in part by Michael Johnson (or his designee) (the "Plan Sponsor") will pay cash to the Debtor's estate in an amount sufficient (after application of the Debtor's Cash on hand) to (i) pay or otherwise satisfy in full Allowed administrative, secured, and priority claims, (ii) fund the Distributions to holders of Claims in Classes 3A and 3B as set forth herein (totaling more than $6 million), (iii) fund the Pro Rata Distribution to holders of general unsecured claims in Class 3C as set forth herein, and (iv) fund a reserve for the Reorganized Debtor and the Plan Administrator, as the case may be, to consummate the Plan and close the Chapter 11 Case (collectively, the "New Value Contribution") and, in turn, the Plan Sponsor will receive 100% of the new equity interests in the Reorganized Debtor, with equity interests in the Debtor to be cancelled. The New Value Contribution and/or proceeds from the sale of the Debtor's assets will be used to make distributions under and in accordance with the Plan, and no other assets will be available for distributions to creditors. The athletes and vendors in Classes 3A and 3B provide unique services that the Debtor believes are essential for the Debtor's go-forward business. Under the Plan, all creditors, including in Class 3C, will be paid at least as much as they would if the Debtor is forced to shutter and liquidate its business. Winners Alliance will provide all or part of the exit financing for the Plan Sponsor. Also, in the event additional costs are expended on a contested hearing on confirmation of the Plan, Distributions may be reduced. Similarly, the Debtor acknowledges certain creditors' public statements indicating a willingness to share recoveries with other creditors, and therefore, the Plan provides creditors with an option to

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Article II hereof.

share their designated distributions with other creditors.

The Plan contemplates the appointment of a Plan Administrator who will be responsible for overseeing the implementation of the Plan, objecting to and settling claims, and making Distributions to creditors.

## C.    Debtor's Recommendation

ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**THE DEBTOR SUPPORTS CONFIRMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN AND RECOMMENDS THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN VOTE TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.  HOWEVER, PRIOR TO DECIDING WHETHER OR HOW TO VOTE ON THIS COMBINED DISCLOSURE STATEMENT AND PLAN, EACH HOLDER OF A CLAIM THAT IS ENTITLED TO VOTE SHOULD CAREFULLY REVIEW ALL OF THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.**

### ARTICLE II

### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

## A.    Defined Terms

For purposes of this Combined Disclosure Statement and Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article II.  Any term used in the Combined Disclosure Statement and Plan that is not defined herein or in other parts of the Combined Disclosure Statement and Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure, shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, in that order of priority.

1.1    **"Accepting Ballot"** means a submitted Ballot to accept the Plan satisfying the requirements of the voting procedures.

1.2    **"Administrative Claim"** means a Claim (other than DIP Claims) for costs and expenses of administration arising on or after the Petition Date and prior to the Effective Date under section 503(b), 503(c), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code; and (c) all fees and charges assessed against the Estate under 28 U.S.C. § 1930.

1.3    "**Administrative Claims Bar Date**" means the date that is thirty (30) days after the Effective Date.

1.4    "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.5    "**Allowed Administrative Claim**" means an Administrative Claim which is an Allowed Claim.

1.6    "**Allowed Claim**" means a Claim against the Debtor as to which no objection has been filed, or if filed, has either been overruled or otherwise resolved by the allowance of such Claim by the Bankruptcy Court, if the Claim was: (1) scheduled in the list of creditors prepared and filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent or unliquidated as to amount; or (2) the subject of a timely filed Proof of Claim; or (3) which has been allowed by order of the Bankruptcy Court.

1.7    "**Allowed Priority Non-Tax Claim**" means a Priority Non-Tax Claim which is an Allowed Claim.

1.8    "**Allowed Priority Tax Claim**" means a Priority Tax Claim which is an Allowed Claim.

1.9    "**Allowed Professional Fees**" means the amount of fees and costs incurred by professionals engaged by the Debtor or any statutory committee appointed in the Chapter 11 Case in connection with the Chapter 11 Case which are (1) timely requested by application filed on or prior to the Administrative Claims Bar Date; and (2) which are allowed by order of the Bankruptcy Court.

1.10    "**Allowed Secured Claim**" means a Secured Claim which is an Allowed Claim.

1.11    "**Allowed General Unsecured Claim**" means a General Unsecured Claim which is an Allowed Claim.

1.12    "**Allowed General Unsecured Claim Fund**" means the portion of the New Value Contribution that is allocated to Pro Rata Distributions to holders of Allowed General Unsecured Claims, equal to at least $200,000, which is greater than the potential distribution amount calculated based on the chapter 7 liquidation analysis attached hereto as Exhibit 1.

1.13    "**Assets**" means all of the Debtor's property, rights, and interests that are property of the Estate pursuant to section 541 of the Bankruptcy Code.

1.14    "**Ballot**" means the form of ballot or ballots that will be distributed to holders of Claims entitled to vote under the Plan in connection with the solicitation of acceptances of the Plan.

1.15    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to this chapter 11 case.

1.16    "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

1.17    "**Bar Date**" means, with respect to any particular Claim, the applicable date set by the Bankruptcy Court as the last day for filing a Proof of Claim or a request for allowance of an Administrative Claim or a proof of interest, against the Debtors in these chapter 11 cases for the applicable Claim or Interest.

1.18    "**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

1.19    "**Chapter 11 Case**" means the Debtor's chapter 11 bankruptcy case pending before the Bankruptcy Court under case number 25-12188 (KBO).

1.20    "**Cash**" means legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items of immediately available funds.

1.21    "**Claim**" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or, a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right is an equitable remedy or is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, against the Debtor.

1.22    "**Claimant**" means a person or entity asserting a Claim.

1.23    "**Class**" means a category of Claims against the Debtor or Interests in the Debtor as set forth in Article V of this Combined Disclosure Statement and Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.24    "**Committee**" means the Official Committee of Unsecured Creditors appointed in this Chapter 11 Case pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [D.I. 51].

1.25    "**Confirmation**" means entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Case.

1.26    "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order.

1.27    "**Confirmation Hearing**" means the hearing or hearings held by the Bankruptcy Court to consider and rule upon the request for confirmation of the Plan.

1.28    "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Plan.

1.29    "**Consummation**" means the occurrence of the Effective Date.

1.30    "**Creditor**" means a person or entity holding a Claim; a Claimant.

1.31    "**Critical Athlete Claim**" means a Claim classified in Class 3A of the Plan.

1.32    "**Critical Vendor Claim**" means a Claim classified in Class 3B of the Plan.

1.33    "**D&O Liability Insurance Policies**" means currently existing insurance policies covering potential liability of directors and officers of the Debtor, as provided for and set forth in each such policy.

1.34    "**Debtor**" means GST, Inc., a Delaware corporation, the debtor and debtor in possession in this Chapter 11 Case. The Debtor may also be referred to as "GST" or the "Company."

1.35    "**DIP Claim**" means any Claims derived from, evidenced by, arising under or in connection with the DIP Documents.

1.36    "**DIP Credit Agreement**" means the *Senior Secured Superpriority Debtor-in-Possession Credit and Security Agreement* (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) approved by the DIP Orders approving the DIP Financing/Cash Collateral Motion.

1.37    "**DIP Documents**" means, collectively, the DIP Credit Agreement and the schedules and exhibits attached thereto, and all agreements, documents, instruments, and amendments executed and delivered in connection therewith.

1.38    "**DIP Lender**" means Winners Alliance, Inc., as lender under the DIP Credit Agreement.

1.39    "**DIP Loans**" means the debtor in possession financing loans extended by Winners Alliance to the Debtor under the DIP Credit Agreement and approved by the Bankruptcy Court pursuant to the Interim DIP Order and the Final DIP Order, as applicable.

1.40    "**DIP Obligations**" means any obligations of the Debtor in connection with the DIP Loans or DIP Documents.

1.41    "**DIP Orders**" means the Interim DIP Order and the Final DIP Order.

1.42    "**Disclosure Statement**" means this Disclosure Statement prepared by the Debtor as required by section 1125 of the Bankruptcy Code.

1.43    "**Disclosure Statement Order**" means the order approving the Disclosure Statement.

1.44    "**Disputed Claim**" means a Claim which has been scheduled as disputed, contingent, or unliquidated where a Proof of Claim has not been filed thereafter, or a Claim as to which an objection has been timely filed with the Bankruptcy Court, and which objection has not been withdrawn on or before any date fixed for filing such objections by this Plan or by order of the Bankruptcy Court and has not been overruled or denied by a final order.

1.45    "**Distribution**" means any distribution by the Debtor, Plan Administrator, or Reorganized Debtor, to any Class, Claimant or Creditor.

1.46    "**Effective Date**" means the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) any and all conditions precedent to the occurrence of the Effective Date as set forth in the Plan have been satisfied or waived.

1.47    "**Eldrige Industries**" means Eldridge Industries, LLC.

1.48    "**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.49    "**Equity Security Interest (or Interest)**" means an "equity security" as defined in section 101(16) of the Bankruptcy Code, including any and all shares of stock, warrants, options, or similar security.

1.50    "**Estate**" means the estate created for the Debtor in the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

1.51    "**Estate Claim**" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or, a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right is an equitable remedy or is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, belonging to the Estate.

1.52    "**Exculpated Party**" means the following entities, each in their respective capacities as such: (a) the Debtor; (b) the Debtor's officers and directors as of the Petition Date; (c) the Committee and each member thereof as of the Confirmation Date (solely in their capacity as such); and (d) any professional retained by order of the Bankruptcy Court to represent the Debtor or the Committee.

1.53    "**Exit Financing Lender**" means Winners Alliance.

1.54    "**File**," "**Filed**," or "**Filing**" means, respectively, file, filed, or filing with the Bankruptcy Court in this Chapter 11 Case.

1.55    "**Final DIP Order**" means the Final Order of the Bankruptcy Court approving the DIP Financing/Cash Collateral Motion [D.I. 94].

1.56    "**Final Order**" means, as applicable, an order or judgment entered by the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek *certiorari* or leave to appeal, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for *certiorari* or motion for leave to appeal, or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* or motion for leave to appeal that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which *certiorari* or leave to appeal could be sought or a new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, that the possibility that a motion under

Rules 59 or 60 of the Federal Rules of Civil Procedure or any comparable Federal Rule of Bankruptcy Procedure or sections 502(j) or 1144 of the Bankruptcy Code may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

1.57    "**Final New Money DIP Loans**" shall have the meaning ascribed to such term in the DIP Orders.

1.58    "**General Unsecured Claim**" means a Claim against the Debtor that is not secured by a charge against, or an interest in, any of the Debtor's Assets, including a Claim arising under section 502(g) of the Bankruptcy Code, but that is not an Administrative Claim, a DIP Claim, a Priority Non-Tax Claim, a Priority Tax Claim, a Critical Athlete Claim (Class 3A), or a Critical Vendor Claim (Class 3B).

1.59    "**Impaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.60    **Interim DIP Order**" means the *Interim Order (I) Authorizing the Debtor to (A) Obtain Senior Secured Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 31].

1.61    "**Interim New Money DIP Loans**" shall have the meaning ascribed to such term in the DIP Orders.

1.62    "**Interim Roll-Up DIP Loans**" shall have the meaning ascribed to such term in the DIP Orders.

1.63    "**New Money DIP Loans**" means, collectively, the Interim New Money DIP Loans and the Final New Money DIP Loans.

1.64    "**New Value Contribution**" means Cash provided by the Plan Sponsor to the Estate in order to fund payments under the Plan, in an amount that is at least sufficient to: (1) pay or otherwise satisfy in full the DIP Loans and DIP Obligations, Allowed Administrative Claims (including Allowed Professionals Fees), Allowed Priority Non-Tax Claims, Allowed Priority Tax Claims and Allowed Secured Claims (to the extent such amount is not waived, or lesser treatment is agreed to, by the Claimant); (2) fund the sum of $6,000,000 for Distribution to holders of Allowed Critical Athlete Claims (an approximately 85% recovery); (3) fund the sum of $82,000 for Distribution to holders of Allowed Critical Vendor Claims (an approximately 85% recovery); (4) fund the sum of $200,000 for Pro Rata Distribution to holders of Allowed General Unsecured Claims under the Plan; and (5) fund a reserve for the Plan Administrator and the Plan Administrator's professionals to administer the Plan in an amount to be agreed upon between the Plan Administrator and Plan Sponsor.

1.65    "**Petition Date**" means December 11, 2025, the date on which the Debtor filed its voluntary Chapter 11 petition commencing this Chapter 11 Case.

1.66    "**Plan**" means this Combined Disclosure Statement and Chapter 11 Plan of Reorganization of GST, Inc. proposed by the Debtor.

1.67    "**Plan Administrator**" means, as of the Effective Date, Nicholas Rubin, as the fiduciary responsible for administering the Combined Disclosure Statement and Plan, and any successor subsequently appointed pursuant thereto.

1.68    "**Plan Sponsor**" means an entity to be formed in connection with the Plan, which shall initially and at least in part be owned and controlled by Michael Johnson (or his designee).

1.69    "**Plan Supplement**" means any supplemental documents filed by the Debtor that is designated by the Debtor as a Plan supplement.

1.70    "**Prepetition Credit Agreement**" shall have the meaning ascribed to such term in the DIP Orders.

1.71    "**Prepetition Lender**" means Winners Alliance, Inc., as lender under the Prepetition Credit Agreement.

1.72    "**Prepetition Secured Claims**" means the Claims on account of the Prepetition Secured Obligations.

1.73    "**Prepetition Secured Obligations**" shall have the meaning ascribed to such term in the DIP Orders.

1.74    "**Priority Non-Tax Claim**" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

1.75    "**Priority Tax Claim**" means a Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.76    "**Professional Fee Applications**" means applications filed pursuant to sections 330, 331, or 503(b)(4) of the Bankruptcy Code for allowance of Administrative Claims relating to the compensation and reimbursement of expenses of professionals employed pursuant to an order of the Bankruptcy Court under sections 327 or 1103 of the Bankruptcy Code for services performed and expenses incurred after the Petition Date and prior to the Effective Date.

1.77    "**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims and Disputed Claims in such Class.

1.78    "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

1.79    "**Released Parties**" means each of, and in each case in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the DIP Lender; (d) the Prepetition Lender; (e) the Plan Sponsor; (f) the Exit Finance Lender; and (g) with respect to each of the Entities in the foregoing clauses (a) through (f), each such Entity's current and former Affiliates (whether held directly or indirectly), predecessors, successors, assigns, subsidiaries, direct and indirect equityholders, interest holders, limited partners, co-investors, directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, board members, financial advisors, partners, consultants, financial advisors, attorneys, accountants, investment bankers, and other professionals.

1.80   "**Releasing Parties**" shall have the meaning ascribed to such term in Article VIII(C) hereof.

1.81   "**Reorganized Debtor**" means the Debtor following the occurrence of the Effective Date of the Plan, including any transferee or successor thereto by merger, consolidation, transfer or otherwise.

1.82   "**Reserve Account**" means an account created pending the resolution of a Disputed Claim, containing a sufficient amount to satisfy such Disputed Claim in a manner consistent with that Claim's treatment under this Plan should it ultimately become an Allowed Claim.

1.83   "**Secured Claim**" means a Claim that is secured by a lien against any Assets of the Estate to the extent of the value of any interest in such Assets of the Estate securing such Claim, or to the extent of the amount of such Claim subject to setoff in accordance with section 553 of the Bankruptcy Code, in either case determined pursuant to section 506(a) of the Bankruptcy Code.

1.84   "**Statutory Fees**" means any fees due and payable pursuant to 28 U.S.C. § 1930, together with the statutory rate of interest set forth in 31 U.S.C. § 3717 to the extent applicable.

1.85   "**U.S. Trustee**" means the Office of the United States Trustee for Region 3.

1.86   "**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

1.87   "**Winners Alliance**" means Winners Alliance, Inc.

## B.   <u>Computation of Time</u>

Unless otherwise indicated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## C.   <u>Governing Law</u>

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

## D.   <u>Controlling Document</u>

In the event of any inconsistency, ambiguity, or conflict between the Plan, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall govern.

E.    **Exhibits**

All exhibits to the Plan are incorporated into and are a part of the Combined Disclosure Statement and Plan as if set forth in full herein.  Exhibits may be attached hereto or as a supplement to the Combined Disclosure Statement and Plan.

**ARTICLE III**

**CASE BACKGROUND AND DISCLOSURES**

A.    **Founding of GST**

In 2023, Michael Johnson, a legendary American track and field athlete and sports broadcaster, conceived of the Company, also known as "Grand Slam Track," as a new professional track and field league intended to operate alongside existing international and domestic track competitions.  Mr. Johnson envisioned a structured, recurring competition format for professional track athletes that would provide more regular, top-notch professional track competitions for athletes, fans, broadcasters, and commercial partners.

Mr. Johnson is widely recognized as one of the most accomplished sprinters in the history of the sport.  He competed internationally for the United States during the 1990s, primarily in the 200-meter and 400-meter events, winning a total of four Olympic gold medals in the Olympic Games in Barcelona (1992), Atlanta (1996), and Sydney (2000), and eight World Championship gold medals from 1991 through 1999.  He set multiple world records and, at the time of his retirement, held the world record times in both the 200 meters and the 400 meters.

Following his retirement from competition, Mr. Johnson remained actively involved in track and field through extensive work as a television commentator and analyst covering international competitions and Olympic Games.  Through these roles, he developed long-standing relationships with athletes, agents, and industry stakeholders and became a prominent public voice on issues affecting professional track and field.  By the time GST was conceived, Mr. Johnson was widely known not only for his athletic accomplishments, but also for his experience and perspective on the commercial and structural aspects of professional track and field, which informed his involvement in the Company's founding.

B.    **The Grand Slam Track Concept**

The Company was formed to address structural characteristics of professional track and field that, in the founders' view, limited sustained fan engagement and commercial development.

At the time the concept was developed, professional track and field largely operated through a collection of independently organized meets, championships, and invitational events, with fragmented media distribution and limited assurance that top athletes would consistently compete against one another.  Mr. Johnson believed that this structure made it difficult to secure long-term media relationships, develop consistent narratives for fans, and create a stable commercial platform for athletes outside of major championship cycles.

The Company's proposed model sought to address these issues by organizing a defined series of competitions featuring advance commitments from participating athletes, enabling more predictable scheduling and clearer presentation to broadcasters, sponsors, and audiences.

## C.    Early Development and Strategic Engagements

During the summer of 2023, Mr. Johnson began working with Stephen Gera to formalize the concept into an operating and financial framework. Mr. Gera played a significant role in the Company's early development by assisting with business planning, financial modeling, investor outreach, and coordination with strategic partners based on Mr. Johnson's strategic direction. These materials were used to solicit feedback from athletes, agents, industry participants, and potential commercial partners regarding the feasibility of a league-style track competition. As the Company progressed from concept to operations, Mr. Gera assumed an executive leadership role and was involved in translating the initial concept into an operating organization.

In August 2023, while attending the World Athletics Championships in Budapest, Mr. Johnson held discussions with athletes, representatives, and other stakeholders to assess interest in a recurring competition format featuring contracted participation. At the same time, Mr. Gera shared the developing materials with sports-focused investment and operating groups to explore potential strategic and financial support for the concept.

In connection with its early development and commercialization efforts, the Company attracted strategic investors, including Winners Alliance, a global organization involved in the commercialization and representation of athletes.

Beginning in late August 2023, Mr. Johnson, Mr. Gera, and representatives of Winners Alliance explored a potential collaboration under which Winners Alliance would assist with diligence, operational development, and fundraising. It was anticipated that Winners Alliance would assist GST with its capital needs by both directly providing capital and assisting GST with fundraising. On September 26, 2023, the parties executed a non-binding term sheet reflecting an intent to collaborate on diligence, operational planning, and early-stage development.

As part of this process, Winners Alliance retained Two Circles, a third-party sports consultancy, to assist with market analysis, product design considerations, and commercial strategy. Throughout the fall of 2023, Mr. Johnson, Mr. Gera, Winners Alliance, and external advisors participated in planning sessions to refine the proposed competition format, athlete engagement model, event cadence, and preliminary commercial assumptions.

## D.    Initial Capitalization and Public Launch

The Company was incorporated as a Delaware corporation on December 28, 2023. Following incorporation, the Company continued development activities focused on refining its operating plan, engaging with prospective athletes and commercial counterparties, and evaluating potential media distribution and sponsorship opportunities.

In February 2024, Mr. Johnson publicly announced that he was building a new professional track league, marking the first public disclosure of the GST concept.

During this period, the Company also engaged legal counsel and began structuring its initial capitalization.  On April 12, 2024, the Company completed a seed financing transaction with Winners Alliance, consisting of $7 million in preferred equity and $6 million pursuant to a "SAFE" (simple agreement for future equity) instrument.

Following the seed financing, the Company hired full-time staff, executed athlete contracts to ensure athlete attendance and participation in competitions, and prepared for launch.  From mid-2024 through early 2025, the Company executed broadcast agreements covering the United States, Europe, and more than 205 territories globally, and entered into multiple sponsorship agreements.  The Company's inaugural season was scheduled to begin in April 2025.

On June 18, 2024, the Company formally launched the league concept at a public event in Los Angeles, California.  At that time, the Company disclosed its intention to operate a series of track meets featuring recurring head-to-head competition among elite athletes, with a defined prize structure and scheduled events.

## E.    Prepetition Financing Efforts

Following the public launch of the "Grand Slam Track" concept in 2024, the Company focused its operational and financial resources on preparing for its inaugural competitive season, which was scheduled to take place in 2025.  While focusing on producing first-rate events, the Company continued to focus on meeting its current and future financial needs.

The Company therefore retained PJT Partners to conduct a formal capital-raising and strategic outreach process.  The engagement contemplated a broad-based market check, including outreach to strategic investors, family offices, private equity sponsors, venture capital firms, and new entrants to the sports and entertainment investment space.  Between January 2025 and March 2025, PJT contacted more than 150 potential investors on behalf of the Company and facilitated extensive diligence and management engagement, including the distribution of marketing and diligence materials, provision of data room access, and coordination of live management presentations.

During this period, members of the Company's management participated in more than 30 live pitch meetings with prospective investors, addressing topics including the planned structure of the inaugural 2025 season, projected operating results, capital requirements, and potential paths to scalability.  Despite this extensive outreach, many prospective investors declined to proceed or deferred investment decisions, frequently citing the early-stage nature of the league, the absence of completed operating results from a full season of competition, uncertainty regarding the ramp-up of media and sponsorship revenues, and the lack of a committed lead investor.

On March 14, 2025, as part of this fundraising process, the Company entered into a non-binding term sheet with Eldridge Industries that contemplated a potential Series A investment.  While the term sheet was non-binding and subject to further diligence, definitive documentation, and internal approvals, Eldridge Industries conducted extensive diligence, was fully informed of the Company's liquidity position, and communicated repeated positive indications regarding its anticipated investment.  The signed term sheet contained an anticipated closing and funding approximately two weeks after execution by the parties on March 14, 2025.

Based on these communications, management reasonably believed that Eldridge Industries was likely to proceed with an investment following successful execution of the inaugural event. Eldridge Industries was aware that the Company intended to proceed with its first scheduled event in Kingston, Jamaica, and encouraged management to do so as part of demonstrating operational execution and market validation.

In late March 2025, Eldridge Industries advised the Company that it would defer any final funding decision until after the completion of the Company's first live competitive event, indicating that it wished to evaluate real-time operational execution and audience response before proceeding.

## F.    **Basis for Early Backing by Investors**

Based on management presentations, performance data available at the time, and discussions with the Company, Winners Alliance and other investors determined to provide capital based on several factors relating to the Company's early market response, media distribution footprint, and perceived commercial potential.

Investors viewed the Company's initial competitive events (referred to as "Slams") as providing early indications of market interest in a league-style professional track and field product, including audience excitement surrounding record-setting performances. Management reported that the Company's first three (3) Slams generated meaningful attendance and fan engagement, including 64,566 ticketed spectators across multiple event days, merchandise sell-outs at each event, and favorable fan feedback metrics, including a "Net Promoter Score" of 68 based on post-event surveys. Management also reported demographic data suggesting that event attendees and viewers skewed relatively young (approximately 60% of attendees under the age of 35) and included significant participation by women (approximately 50% female attendance). Investors considered these metrics as suggesting early engagement from a relatively young and diverse audience segment that had not historically been the primary focus of traditional track and field competitions.

Investors also were influenced by the Company's early media distribution footprint and global exposure. The Company secured broadcast and streaming distribution across 205 countries and international territories, including distribution through major domestic and international media outlets such as NBC, Peacock, The CW, and Eurosport. Management reported that the Company achieved an average of 7 million global viewers and substantial digital and social media engagement—including nearly 260 million social media impressions and nearly 150 million online video views—during its initial season. Investors viewed this early distribution as evidence that the "Grand Slam Track" concept could resonate with a global audience and that the social media reach of participating athletes (who collectively maintained nearly 16 million social media followers) could amplify the Company's media presence and brand visibility.

Investors considered the Company's potential to generate revenue across multiple categories commonly associated with professional sports properties. At the time of investment, the Company's business plan contemplated revenue opportunities from media rights, sponsorships, live events and hospitality, merchandise sales, licensing, and related commercial initiatives. Investors appreciated the size and global reach of the broader running and racing market in evaluating the potential scalability of the Company's platform, while recognizing that the realization of such opportunities would depend on execution and market conditions.

Finally, investors viewed the Company as an early entrant seeking to organize professional competition in a sport with broad global participation. Based on the Company's ability to attract elite athletes, secure media distribution, and generate early fan engagement, investors believed that the Company had the potential to establish a differentiated brand within professional track and field. This early traction was viewed as supporting the Company's efforts to build a sustainable commercial platform, although investors understood that the long-term success of the business would depend on continued execution, capital availability, and market acceptance.

## G.    Events Leading to the Filing of the Chapter 11 Case

In the period leading up to the commencement of this Chapter 11 Case, the Company continued to operate and execute its inaugural season based on good-faith and reasonable expectations of additional funding from multiple sources, including extensive diligence and repeated positive indications from potential investors that were fully informed of the Company's liquidity position. Although certain term sheets, including with Eldridge Industries, were non-binding, based on communication provided to GST's management, management reasonably believed that continued operational execution—particularly the successful completion of the Company's first scheduled event—would result in committed capital and enable GST to preserve enterprise value.

At the same time, the Company had made firm commitments to athletes, broadcasters, and commercial partners, and cancelling events after athletes had structured their training and competitive calendars around those competitions would have caused the Company material disruption and reputational harm. The liquidity challenges and resulting pressure from creditors that ultimately led to this filing were driven by the timing and withdrawal of anticipated financing and the inherent capital demands of launching a new professional sports league.

### 1.    Execution of the Inaugural 2025 Season Amid Ongoing Financing Efforts

Following the deferral of the proposed Series A investment by Eldridge Industries, the Company and PJT continued capital raising efforts, receiving indications from other investors while proceeding with its inaugural competitive season in 2025. Management and new indicative investors determined that proceeding with the scheduled events was necessary to preserve the value of the league, demonstrate operational execution, and continue engagement with potential investors, broadcasters, sponsors and strategic partners.

Management determined that proceeding with the scheduled events was necessary not only to preserve the value of the league and demonstrate operational execution, but also because the Company had made firm commitments to contracted athletes, broadcasters, and commercial partners. Moreover, cancelling scheduled competitions after athletes had committed, trained, and structured their competitive calendars around those events would have caused material disruption to their preparation for major international competitions, including the World Athletics Championships, and would have undermined trust with the athletic community critical to the league's long-term viability.

The Company held its inaugural event in Kingston, Jamaica from April 4 through April 6, 2025. This event marked the Company's first live execution of its league-format concept and required substantial upfront expenditures, including costs associated with venue operations, live event production, media and broadcast production, athlete compensation, travel

and hospitality, marketing, and staffing.  Those expenditures were incurred pursuant to pre-existing contractual and operational commitments required to stage the event and were undertaken as part of a value-preserving strategy to validate the product and obtain committed financing, rather than to expand operations or assume incremental risk.

Representatives of Eldridge Industries attended the Kingston event and provided positive feedback regarding execution and audience engagement.  Management understood this feedback, together with prior diligence and communications, as reinforcing the likelihood of a post-event investment.  On April 11, 2025, however, Eldridge Industries informed the Company that it would not proceed with the proposed Series A investment, leaving the Company without a committed institutional capital source early in its first season.

After receiving the news from Eldridge Industries that it would not be investing, GST raised several million dollars from various sources.  The Company proceeded with its second and third events in Miami, Florida and Philadelphia, Pennsylvania.  These events demonstrated improvements in certain commercial and operational metrics relative to the inaugural event, including attendance, sponsorship activation, and local market engagement.  These events were supported through limited, incremental funding from new and existing stakeholders primarily intended to satisfy near-term operational obligations and preserve going-concern value.  In parallel, the Company implemented cash preservation measures and engaged with key counterparties regarding payment timing and resolution of obligations, with the objective of minimizing incremental liabilities while continuing to pursue financing alternatives.

## 2.    Structural Drivers of the Company's Financial Stress

The Company's financial challenges leading to the commencement of the Chapter 11 Case were driven by several interrelated structural and situational factors:

*First*, the Company incurred a high-cost structure associated with launching a globally distributed sports league from inception.  The Company sought to deliver a premium, world-class product across multiple international locations in its first season, which required significant expenditures for live event operations in three cities, global media production and distribution, athlete compensation, travel and hospitality, marketing, and start-up personnel and infrastructure.  Although the Company generated revenue across all major channels in its first season, including media, sponsorship, ticketing, and merchandise, those revenues were insufficient to offset the substantial upfront costs required to meet the expectations of athletes, broadcasters, and fans.

*Second*, the Company faced challenges related to the timing and availability of capital.  The Company's financing needs outpaced its available resources, and it was unable to secure adequate follow-on investment in time to stabilize operations and fund preparations for a second season.  These challenges were exacerbated by the long lead times required to schedule, underwrite, and produce global sporting events; the rapid cash utilization typical of early-stage professional sports leagues; and a broader capital market environment in which venture-style and sports-media investments had become increasingly conservative.

*Third*, while the Company experienced strong consumer traction and engagement during its inaugural season, the Company faced a mismatch between the pace at which revenues could scale and its ongoing operational burn rate.  Many of the revenue streams contemplated in the Company's business plan—including expanded media rights arrangements, sponsorship growth, commerce integration, and international licensing—were expected to develop over

multiple seasons.  As a result, although the Company was able to demonstrate demand for its product, it lacked a sustained financing runway sufficient to allow those revenue streams to mature to a level that could support ongoing operations at scale.

*Finally*, the Company determined that operational restructuring would be necessary to achieve long-term viability.  Management believed that a more efficient cost structure could be implemented and that meaningful operational improvements were possible without compromising the fan or athlete experience.  However, by the time these potential efficiencies could be identified and implemented, the Company's liquidity constraints had become acute.

### 3.      Liquidity Preservation and Creditor Pressure

As the season progressed, the Company's cash resources became increasingly constrained.  In order to conserve cash and limit additional liabilities, the Company canceled its planned fourth event in Los Angeles, California, which had been scheduled for June 2025, and implemented workforce reductions and other cost-containment measures.  These actions were taken to preserve remaining liquidity while management continued to pursue financing alternatives and strategic solutions.

From July through December 2025, the Company continued efforts to raise additional capital and explore strategic transactions, while simultaneously engaging in negotiations with athletes, vendors, and other counterparties regarding unpaid or partially unpaid obligations incurred during the season.  During this period partial payments were made to some vendors.  In October 2025, the Company made partial payments to athletes, which was critical to maintain athlete commitment to the Company and avoid the destruction of enterprise value.  During the same period, the Company reached out to its creditors to attempt to negotiate consensual resolutions, including offering similar partial payment terms to its vendors, but that offer was declined by certain creditors.  Despite these efforts, the Company was unable to reach a resolution with its creditors or to generate sufficient liquidity to satisfy all outstanding obligations as they came due.

Prior to the Petition Date in December 2025, a group of creditors delivered a written threat that they intended to commence an involuntary insolvency proceeding to liquidate GST.

### 4.      Evaluation of Strategic Alternatives and Benefits of Chapter 11

As a result of the foregoing financial challenges, the Company evaluated a range of strategic alternatives, including additional out-of-court financing, asset-level transactions, consensual creditor arrangements, and operational downsizing.  After consultation with its advisors and consideration of the Company's liquidity position, capital needs, and creditor landscape, and, in large part, as a result of certain creditors threatening an involuntary bankruptcy filing, the Company determined that these alternatives were insufficient to stabilize the business on a timely basis or to preserve enterprise value.

The Company determined that a reorganization under chapter 11 of the Bankruptcy Code represented the most prudent and appropriate course of action to preserve and stabilize the business for the benefit of the Estate and all creditors.  In particular, the Company concluded that chapter 11 would provide a framework to:

> •      preserve and protect the Company's intellectual property, media assets, athlete relationships, and brand equity;

17

- restructure liabilities in a manner better aligned with the Company's future revenue potential;

- preserve and maximize value for creditors, investors, and commercial partners while maintaining continuity of operations;

- facilitate a potential infusion of new capital through debtor-in-possession financing or a plan sponsor transaction; and

- implement a more efficient cost structure and operating model to reposition the Company for sustainable long-term growth.

To assist the Company and its management in connection with its reorganization goals, the Company added an Independent Director to its Board of Directors (the "Board"). In addition, the Board decided to engage Nicholas Rubin as the Debtor's Chief Restructuring Officer ("CRO") (by and through Force 10 Advisors, LLC) to assist and shepherd the Company through its reorganization efforts.

Accordingly, on the Petition Date, the Company commenced this voluntary Chapter 11 Case by filing a petition for relief under chapter 11 of the Bankruptcy Code the Bankruptcy Court.

## H.    **Assets and Capital Structure**

The Debtor's Assets as of the Petition Date consisted principally of intangible assets, including intellectual property, contractual rights, and goodwill associated with the Grand Slam Track brand. These Assets include, among other things, proprietary league concepts and formats, trademarks and branding rights, content and media-related rights, and relationships or contracts with athletes, sponsorship agreements, broadcast and distribution agreements, and related commercial and intellectual property rights.

In addition to its intangible Assets, the Debtor holds certain cash, accounts receivable, deposit accounts, and contractual rights arising from its prepetition operations. The value of the Debtor's enterprise is primarily derived from its intellectual property, contractual relationships, and brand goodwill rather than from hard assets.[3] The Debtor also understands that payments the Debtor made immediately preceding this Chapter 11 Case to certain vendors and athletes may be subject to avoidance pursuant to section 547 of the Bankruptcy Code, but that defenses to such claims may exist. The Debtor is not aware of other potential material Assets of the estate.

As of the Petition Date, the Debtor was indebted to Winners Alliance on a secured basis in an aggregate amount of approximately $5.02 million (the "Prepetition Secured Obligations") arising under a *Promissory Note and Security Agreement*, dated as of March 6, 2025, *Promissory Note and Security Agreement*, dated as of March 27, 2025, and *Promissory Note and Security Agreement*, dated as of December 8, 2025 (collectively, the "Prepetition Credit Agreements"). The Debtor believes it has no other prepetition secured obligations.

---

[3]  The Debtor does not own real property or other significant hard Assets; accordingly, the value of the Debtor's Estate is primarily dependent on the preservation of its intellectual property, contractual relationships, connection to the Debtor's founders including Mr. Johnson, and brand goodwill.

Specifically, the Debtor's secured debt structure as of the Petition Date is summarized as follows:

| Winners Alliance Debt Facilities | Principal Amount Outstanding[4] |
|---|---|
| Promissory Note and Security Agreement (March 6, 2025) | $3.0 million |
| Promissory Note and Security Agreement (March 27, 2025) | $1.0 million |
| Promissory Note and Security Agreement (December 8, 2025) | $1.02 million |
| **Total Secured Debt:** | **Approx. $5.02 million** |

As discussed in further detail below, a portion of the Prepetition Secured Obligations have been "rolled-up" into the DIP Obligations.

The Prepetition Secured Obligations are secured by substantially all of the Debtor's Assets, including tangible and intangible personal property and rights, whether now owned or hereafter acquired, including, without limitation: intellectual property and brand rights; contracts with athletes; media, sponsorship, and distribution agreements; accounts; deposit accounts; general intangibles; any causes of action; and proceeds of the foregoing, as more fully described in the Prepetition Credit Agreement.

In addition to the Prepetition Secured Obligations, Winners Alliance asserts unsecured claims against the Debtor in excess of approximately $6.1 million arising from prepetition advances, interest, fees, expenses, and other obligations (in addition to Winners Alliance's $6 million SAFE investment).

The Debtor also has other significant unsecured obligations arising from its prepetition operations, consisting primarily of amounts owed to athletes, vendors, contractors, service providers, and other trade creditors. Based on the Debtor's books and records, the Debtor estimates that its unsecured obligations, exclusive of Winners Alliance's alleged unsecured claims, total approximately $23.6 million as of the Petition Date, consisting of approximately $68,000 Priority Claims, $7 million owed to athletes, and approximately $13 million owed to other vendors, subject to reconciliation and exclusive of any contingent, unliquidated, or contract rejection claims.[5]

Given the Debtor's substantial operating losses, the Debtor does not anticipate a material near-term income tax liability, although final tax obligations remain subject to review and determination.

---

[4] Amounts reflected herein are based on the Debtor's books and records as of the Petition Date, may not reflect current amounts, and remain subject to reconciliation, including through the claims allowance process.

[5] The Debtor's filed *Schedules of Assets and Liabilities* also include approximately $2 million in SAFE investments (in addition to Winners Alliance's SAFE investment) that will receive no recoveries on their investment and are excluded from Classes 3A, 3B and 3C.

## I.    The Debtor's Chapter 11 Case

### 1.    Motion to Approve the DIP Loan Agreement and DIP Obligations

On December 21, 2025, the Debtor filed a motion to approve debtor in possession financing and for authorization to use cash collateral (the "**DIP Financing/Cash Collateral Motion**"), pursuant to which the Debtor requested entry of the DIP Orders authorizing the Debtor to obtain postpetition secured financing, approving the DIP Credit Agreement, granting perfected liens to secure the DIP Obligations, authorizing the use of cash collateral, granting adequate protection, and granting related relief.  An interim hearing on the DIP Financing/Cash Collateral Motion was held on December 23, 2025 and on that date, the Court entered the Interim DIP Order authorizing the Debtor to, among other things, obtain the Interim New Money DIP Loans in the aggregate principal amount of up to $1,100,000 (of which the Debtor has borrowed $1,000,000) and, upon each advance of Interim New Money DIP Loans, a "roll up" of Prepetition Secured Obligations of the Debtor under the Prepetition Credit Agreement in an amount equal to such advance (each as defined in the DIP Credit Agreement). Accordingly, the "**Interim DIP Loans**" consist of the Interim Roll-Up DIP Loans and Interim New Money DIP Loans.  As of the date of the filing of the Plan, the total amount of Interim DIP Loans outstanding is $2,000,000.

A final hearing on the DIP Financing/Cash Collateral Motion occurred on February 4, 2026, at which time the Court granted the DIP Financing/Cash Collateral Motion on a final basis as provided in the Final DIP Order, approving, in addition to the Interim DIP Loans, a new money term loan facility in the aggregate principal amount not to exceed $1,350,000 and a corresponding "roll-up" of up to $1,325,000 of the Prepetition Secured Obligations to be rolled up upon, and an amount equal to, the Final New Money DIP Loan draw (collectively, the "DIP Facility").

### 2.    Application to Appoint Stretto, Inc. as Claims/Noticing Agent

On December 18, 2025, the Debtor filed the *Debtor's Application for Entry of an Order Authorizing the Debtor to Retain Stretto, Inc. as Claims and Noticing Agent, Effective as of the Petition Date* to retain Stretto, Inc. as the Debtor's claims and noticing agent, and which the Bankruptcy Court granted at a hearing held on December 23, 2025, as set forth in that certain order entered on December 23, 2025 [D.I. 29].

### 3.    Motion Authorizing the Debtor to Redact Certain Personal Identification Information

On December 18, 2025, the Debtor filed the *Debtor's Motion for Entry of Order (I) Authorizing the Debtor to Redact Certain Personal Identification Information and (II) Granting Related Relief* seeking authority to redact certain personal identification information in pleadings and other documents filed with the Bankruptcy Court, which the Bankruptcy Court granted at a hearing held on December 23, 2025, as set forth in that certain order entered on December 23, 2025 [D.I. 30].

### 4.    Motion to Extend Deadline to File Schedules or Provide Required Information

On January 8, 2026, the Debtor filed the *Debtor's Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities and Statement of Financial*

*Affairs and (II) Granting Related Relief* pursuant to which the Debtor requested an extension of time within which the Debtor must file its schedules of assets and liabilities and statement of financial affairs through and including January 22, 2026, and which the Bankruptcy Court approved, as set forth in that certain order entered on February 3, 2026 [D.I. 89].

On January 22, 2026, the Debtor filed its *Schedules of Assets and Liabilities* [D.I. 67] and *Statement of Financial Affairs* [D.I. 68].

### 5.    Motion Authorizing Debtor to Retain Force 10 to Provide Nicholas Rubin as CRO and Additional Personnel, and Related Relief

On January 9, 2026, the Debtor filed the *Motion for Entry of an Order (I) Authorizing Debtor to Retain Force Ten Partners, LLC/Force Ten Advisors, LLC to Provide Nicholas Rubin as Chief Restructuring Officer and Additional Personnel, as Necessary, Effective as of the Petition Date; (II) Approving the Engagement Agreement; and (III) Granting Related Relief*, which the Bankruptcy Court approved, as set forth in that certain order entered on February 3, 2026 [D.I. 86].

### 6.    Application of Debtor to Employ Levene, Neale, Bender, Yoo & Golubchik L.L.P. as Lead Bankruptcy Counsel

On January 9, 2026, the Debtor filed the *Application of the Debtor for Entry of an Order Pursuant to Bankruptcy Code Sections 327(a), 328, 330, and 1107 Authorizing Employment and Retention of Levene, Neale, Bender, Yoo & Golubchik L.L.P. as Lead Bankruptcy Counsel for the Debtor and Debtor in Possession Effective as of the Petition Date*, which the Bankruptcy Court approved, as set forth in that certain order entered on February 3, 2026 [D.I. 88].

### 7.    Application of Debtor to Employ Reed Smith LLP as Co-Counsel

On January 9, 2026, the Debtor filed the *Application of the Debtor for Entry of an Order Pursuant to Bankruptcy Code Sections 327(a), 328, 330, and 1107 Authorizing Employment and Retention of Reed Smith LLP as Co-Counsel for the Debtor and Debtor in Possession Effective as of the Petition Date*, which the Bankruptcy Court approved, as set forth in that certain order entered on February 3, 2026 [D.I. 87].

### 8.    Motion For Entry of Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals

On January 9, 2026, the Debtor filed the *Debtor's Motion for Entry Of an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, which the Bankruptcy Court approved, as set forth in that certain order entered on February 3, 2026 [D.I. 85].

9. **Potential Motion (I) for Entry of an Order Approving Sale Timeline, Bidding Procedures and Related Relief and (II) for Entry of an Order Approving the Debtor's Sale of all or Substantially all of the Debtor's Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases**

The Debtor may file a *Motion Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code: (I) for Entry of an Order Approving Sale Timeline, Bidding Procedures and the Form and Manner of Notices thereof and related thereto, and (II) For Entry of an Order Approving the Debtor's (A) Sale of all or Substantially all of the Debtor's Assets Free and Clear of All Encumbrances other than Assumed Liabilities and (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to the Successful Bidder; and (III) Granting Related Relief*, to solicit interests in the Debtor's Assets outside of the Plan context.  In the event a sale of substantially all of the Debtor's Assets occurs, the Plan shall be deemed to incorporate such sale and provide for the proceeds from such sale to be utilized to pay Allowed Claims as provided under the Plan (in lieu of the New Value Contribution).  The Debtor intends to confer with the Committee regarding such potential motion.

## ARTICLE IV

## DIP OBLIGATIONS, ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth below in Article V.

A. **DIP Obligations**

On the Effective Date, the DIP Obligations shall be satisfied in full, as follows:

The DIP Lender shall receive on account of the Debtor's DIP Obligations, at the option of the Debtor:

(1) indefeasible payment in full in Cash of the outstanding amount due under the DIP Credit Agreement to the DIP Lender; or

(2) such other terms as may be mutually agreed upon between the Debtor, DIP Lender and Plan Sponsor that would not result in any lesser recovery to the Debtor's other creditors than if the DIP Lender was paid in full in Cash from the DIP Collateral (as defined in the DIP Credit Agreement) on the Effective Date.

B. **Administrative Claims**

Administrative Claims are Claims for costs or expenses of administering the Chapter 11 Case that are allowed under section 507(a)(2) of the Bankruptcy Code.  The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date unless a particular holder of an Administrative Claim agrees to a different treatment.

Statutory Fees, to the extent not previously paid, will be paid in full on the Effective Date, or at such later date as such fees may become due and payable.

Allowed Administrative Claims, including Allowed Professional Fees, will be paid using the Debtor's cash on hand and the New Value Contribution. All Allowed Professional Fees, which are unpaid as of the Effective Date, will be paid on the later of the (a) Effective Date; and (b) date of entry of the order allowing the professional fees and costs.

Requirement of Court Approval of Fees: The Court must rule on all fees of professionals listed above before such fees will become Allowed Administrative Claims. For all professional fees, the professional in question must file and serve a properly noticed fee application, and the Bankruptcy Court must rule on the application. Only Allowed Professional Fees will be eligible to be paid under the Plan.

## C.      Priority Tax Claims

The Debtor has scheduled a total of $33,995.16 of Priority Tax Claims. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of such Allowed Priority Tax Claim will be paid in full in Cash on or as soon as reasonably practicable after the latest of: (a) the Effective Date; (b) the date such Priority Tax Claim is Allowed; and (c) the date such Allowed Priority Tax Claim becomes due and payable. Except as otherwise allowed by the Bankruptcy Court, holders of Priority Tax Claims shall not be entitled to receive any penalties with respect to or arising in connection with such Claims and such penalties shall be treated as General Unsecured Claims.

## ARTICLE V

## CLASSIFICATION AND TREATMENT
## OF CLAIMS AND INTERESTS

## A.      Classification of Claims and Interests

Except for the Claims addressed in Article IV of this Combined Disclosure Statement and Plan, all Claims against and Interests in the Debtor are classified in the Classes set forth in this Article V for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein or the actual Distributions received by holders of Allowed Claims. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's estimates as of the date hereof only.

In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, it is underscored that the Debtor makes no representation as to the accuracy of these recovery estimates.  The Debtor expressly disclaims any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received or errors discovered).

| Class | Claim/Interest | Estimated Allowed Amount of Claims[6] | Status | Voting Rights | Projected Recovery[7] |
|-------|----------------|----------------------------------------|--------|---------------|------------------------|
| 1 | Prepetition Secured Claims | $5,000,000[8] | Impaired | Entitled to Vote | Undetermined |
| 2 | Priority Non-Tax Claims | $34,300.00 | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 3A | Critical Athlete Claims | $7,000,000 | Impaired | Entitled to Vote | Approx. 85% |
| 3B | Critical Vendor Claims | $97,000 | Impaired | Entitled to Vote | Approx. 85% |
| 3C | General Unsecured Claims | $12,900,000 | Impaired | Entitled to Vote | Approx. 1.5% |
| 4 | Interests | $0 | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

## B.   Treatment of Claims and Interests

Subject to Article XI hereof, each holder of an Allowed Claim against or Allowed

---

[6]  These amounts represent estimated Claims against the Debtor and are not limited to amounts actually asserted by Creditors in Proofs of Claim or otherwise.  The Debtor has not completed its analysis of Claims in the Chapter 11 Case, and all objections to such Claims have not been filed or fully litigated and may continue following the Effective Date.  Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time.  Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.  This amount also may change if Claims are added or removed from Classes.

[7]  The estimated percentage recovery is based on, among other things, an estimate of the Allowed Claims against the Debtor in the Chapter 11 Case.  As noted, the actual amount of the Allowed Claims may be greater or lower than estimated.  Thus, the actual recoveries may be higher or lower than projected depending on, among other things, the amounts and priorities of Claims that are Allowed by the Bankruptcy Court and the actual amount of Cash available for Distribution.

[8]  To the extent not rolled up under the DIP Facility.  The Debtor estimates no cash recovery will be received by the Prepetition Lender on account of the Prepetition Secured Claims.

Interest in the Debtor, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtor, or the Plan Administrator, as applicable, and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.       **Class 1 – Prepetition Secured Claims**

(a) *Classification:* Class 1 consists of the Prepetition Secured Claims.

(b) *Treatment:* The holder of the Prepetition Secured Claim has agreed to waive any right under the Plan to recovery of Cash from (i) the Debtor (other than any proceeds from causes of action upon which it has a lien) or (ii) the New Value Contribution. To the extent of any unpaid portion of the Prepetition Secured Claim, in full and final satisfaction, settlement, release, and discharge of the Allowed Prepetition Secured Claim, the Prepetition Lender shall solely receive, on the Effective Date or as soon thereafter as is practicable, reinstatement of such Allowed Prepetition Secured Claim in a substantially reduced amount to be determined in connection with the exit financing, or such less favorable treatment as the Prepetition Lender agrees.

(c) *Voting:* Class 1 is impaired under the Plan. The Prepetition Lender is entitled to vote to accept or reject the Plan.

2.       **Class 2 – Priority Non-Tax Claims**

(a) *Classification:* Class 2 consists of all Priority Non-Tax Claims.

(b) *Treatment*: Except to the extent that the holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Non-Tax Claim shall receive payment in full in Cash of the Allowed amount of such Claim (as determined by settlement or Final Order of the Bankruptcy Court) on the Effective Date, or as soon as reasonably practicable, or such other treatment rendering such Claim unimpaired.

(c) *Voting:* Class 2 is unimpaired under the Plan. Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

3.       **Class 3A – Critical Athlete Claims**

(a) *Classification*: Class 3A consists of the Critical Athlete Claims are identified in **<u>Exhibit 2</u>** hereto.

(b) *Treatment*: Except to the extent that the holder of an Allowed Critical Athlete Claim agrees to less favorable treatment, each holder of an Allowed Critical Athlete Claim in Class 3A shall receive, in full, final and complete satisfaction, settlement, release,

and discharge of such Claim, either:

    i.    if such holder submits an Accepting Ballot (or submits no Ballot but Class 3A accepts the Plan), a payment in Cash equal to approximately 85% of such holder's Allowed Critical Athlete Claim from the New Value Contribution with such payment to be made on, or as soon as practicable after, the Effective Date; or

    ii.    if such holder submits a Ballot but does not submit an Accepting Ballot or submits an Accepting Ballot but opts to be treated as a Class 3C General Unsecured Claim, each such holder of an Allowed Critical Athlete Claim shall be treated as a Class 3C creditor and receive its Pro Rata distribution of the Allowed General Unsecured Claim Fund and the amount of the Distribution that such holder of the Critical Athlete Claim would have received under subsection (i) in Class 3A will instead be contributed to the Allowed General Unsecured Claim Fund for Class 3C for the benefit of all holder of Allowed General Unsecured Claims in Class 3C on the same terms of treatment set forth herein for Class 3C.

In the event Class 3A (as a Class) votes to reject the Plan, no Distribution under the Plan will be made to holders of Class 3A Claims.

(c)   *Voting*: Class 3A is Impaired under the Plan. Holders of Allowed Critical Athlete Claims are entitled to vote to accept or reject the Plan.

**4.      Class 3B – Critical Vendor Claims**

(a)   *Classification*: Class 3B consists of the Critical Vendor Claims are identified in **Exhibit** 3 hereto.

(b)   *Treatment*: Except to the extent that the holder of an Allowed Critical Vendor Claim agrees to less favorable treatment, each holder of an Allowed Critical Vendor Claim in Class 3B shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Claim, either:

    i.    if such holder submits an Accepting Ballot (or submits no Ballot but Class 3B accepts the Plan), a payment in Cash equal to approximately 85% of such holders Allowed Critical Vendor Claim from the New Value Contribution with such payment to be made on, or as soon as practicable after, the Effective Date; or

    ii.    if such holder submits a Ballot but does not submit an Accepting Ballot or submits an Accepting Ballot but opts to be treated as a Class 3C General Unsecured Claim, each such holder of an Allowed Critical Vendor Claim shall be treated as a Class 3C Creditor and receive its Pro Rata distribution of the Allowed General Unsecured Claim Fund and the amount of the Distribution that such holder of the Critical Vendor Claim would have received under subsection (i) in Class 3B will instead be contributed to the Allowed General Unsecured Claim Fund for Class 3C for the benefit of all holder of Allowed General Unsecured

Claims in Class 3C on the same terms of treatment set forth herein for Class 3C.

In the event Class 3B (as a Class) votes to reject the Plan, no Distribution under the Plan will be made to holders of Class 3B Claims.

(c) *Voting*: Class 3B is Impaired under the Plan. Holders of Allowed Critical Vendor Claims are entitled to vote to accept or reject the Plan.

**5.      Class 3C – General Unsecured Claims**

(a) *Classification*: Class 3C consists of General Unsecured Claims

(b) *Treatment*: Except to the extent that the holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive a Pro Rata distribution of the Allowed General Unsecured Claim Fund.

In the event Class 3C (as a Class) votes to reject the Plan, no Distribution under the Plan will be made to holders of Class 3C Claims.

(c) *Voting*: Class 3C is Impaired under the Plan. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

**6.      Class 4 – Interests**

(a) *Classification:* Class 4 consists of all Equity Security Interests in the Debtor.

(b) *Treatment:* On the Effective Date, all Equity Security Interests in the Debtor shall be cancelled, released, and extinguished, and the holders of Equity Security Interests shall receive no Distribution under the Plan.

(c) *Voting:* Class 4 is impaired under the Plan. Holders of Equity Security Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

**C.      <u>Special Provision Governing Unimpaired Claims</u>**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtor's rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

**D.      <u>Subordinated Claims</u>**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of

the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtor and the Plan Administrator reserve the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes

Any Class of Claims or Interests that does not have a holder of a Claim or Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### F.    Nonconsensual Confirmation

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtor shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtor reserves the right to modify the Plan in accordance with Article XV of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

### G.    Acceptance or Rejection of the Plan

#### 1.    Voting Classes

Classes 1, 3A, 3B and 3C are entitled to vote on the Plan.

#### 2.    Presumed Acceptance of the Plan

Pursuant to the Bankruptcy Code, Class 2 is deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

#### 3.    Presumed Rejection of the Plan

Pursuant to the Bankruptcy Code, Class 4 is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

### H.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court may, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### I.    No Waiver

Nothing contained in this Plan shall be construed to waive the Debtor's or the Plan

Administrator's right to object on any basis to any Claim, including after the Effective Date.

## ARTICLE VI

## CONFIRMATION AND VOTING PROCEDURES

### A.    Confirmation Procedures

The Disclosure Statement Order, among other things, will conditionally approve the Combined Disclosure Statement and Plan for solicitation purposes only and authorize the Debtor to solicit votes to accept or reject the Plan.  The Confirmation Hearing will be scheduled for [**April 16, 2026 at 9:30 a.m. (ET)**] at the Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom #3, Wilmington, Delaware 19801 to consider (i) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.  **Unless an objection to the Combined Disclosure Statement and Plan is timely filed and served, it may not be considered by the Bankruptcy Court.**

### B.    Procedure for Objections

Any objection to interim approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code must be made in writing and filed with the Bankruptcy Court and served on _____, by no later than **March [__], 2026 at 4:00 p.m. (ET)**.  Any objection to final approval of the Disclosure Statement and Confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on _____, in each case, by no later than **[April 9,] 2026 at 4:00 p.m. (ET)**.  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### C.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all of the applicable requirements of section 1129 of the Bankruptcy Code. Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible.  The Bankruptcy Court must also find that the Plan (x) classifies Claims and Interests in a permissible manner; (y) complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (z) has been proposed in good faith.

Additionally, pursuant to section 1126 of the Bankruptcy Code, under the Combined Disclosure Statement and Plan, only the Voting Classes are entitled to vote.

### D.    Classification of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity security holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the

treatment for each Class (other than those Claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified). The Debtor is also required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtor believes that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the Debtor's classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtor intends, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

### E.    <u>Impaired Claims or Interests</u>

Pursuant to the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject the plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are altered under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, holders of Claims in Classes 1, 3A, 3B and 3C are Impaired and are entitled to vote on the Plan. Under the Plan, holders of Claims or Interests in Class 4 are Impaired and will not receive or retain any property under the Plan on account of such Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan. Under the Plan, holders of Claims in Class 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1, 3A, 3B AND 3C.

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY**.

**F.    Confirmation Pursuant to Bankruptcy Code Sections 1129(a)(10) and 1129(b)**

Pursuant to Section 1129(b) of the Bankruptcy Code, the Debtor, as the proponent of the Plan, hereby requests that the Bankruptcy Court find that the provisions of the Plan do not discriminate unfairly and provide fair and equitable treatment to those Classes which are impaired under the Plan and which elected not to accept the Plan, and that the Bankruptcy Court confirm the Plan notwithstanding the requirement of Section 1129(a)(10) of the Bankruptcy Code as to such Classes.

**G.    Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Plan).  For purposes of this test, the Debtor has analyzed the ability of the Debtor to meet its obligations under the Plan.  Based on the Debtor's analysis and given that the New Value Contribution is required to be deposited with the Debtor at least five (5) days prior to the Confirmation Hearing, the Debtor will have sufficient Assets to accomplish its tasks under the Plan.  Therefore, the Debtor believes that the transactions to be effectuated pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

**H.    Best Interests Test and Liquidation Analysis**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the bankruptcy court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable Distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case was converted to a case under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the Distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

31

Here, the Debtor believes, and its liquidation analysis demonstrates, that the Combined Disclosure Statement and Plan satisfies the best interests test as the recoveries expected to be available to holders of Allowed Claims under the Combined Disclosure Statement and Plan will be greater than the recoveries expected in a liquidation under chapter 7 of the Bankruptcy Code. The New Value Contribution will be in excess of $6 million and the amount will be sufficient to (i) pay or otherwise satisfy in full the DIP Obligations, Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Claims, Allowed Priority Tax Claims, and (ii) fund the Distributions set forth in the Plan, including funding the Allowed General Unsecured Claim Fund in an amount at least equivalent to the anticipated recoveries to holders of Allowed General Unsecured Claims in a chapter 7 liquidation (and presumes pursuit of potential preference actions of the Debtor). The Debtor believes that the aggregate amount of DIP Obligations, Secured Claims, Administrative Claims, Priority Non-Tax Claims, and Priority Tax Claims asserted against the Debtor is substantially greater than the liquidation value of the Debtor.

## ARTICLE VII

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Funding for the Plan

The Plan will be funded by the New Value Contribution and any other Cash of the Estate on hand as of the Effective Date. The Plan Sponsor shall deposit the New Value Contribution into a segregated account designated by the Debtor at least five (5) days prior to the Confirmation Hearing. Additionally, capital contributions to the Reorganized Debtor will be made by the Plan Sponsor to provide the Reorganized Debtor with adequate funding for the Reorganized Debtor's business as set forth in the Plan.

### B.    Composition of the Reorganized Debtor

On the Effective Date, and provided that the New Value Contribution has been paid to the Estate, all of the Debtor's and the Estate's Assets (including, without limitation, all claims and causes of action of the Estate) shall be retained by and revested in the Reorganized Debtor, free and clear of all liens, claims and interests, except for Cash and the New Value Contribution which shall remain as property of the Estate. The Reorganized Debtor's initial management will remain the same and will consist of Michael Johnson, as Chief Executive Officer, and Stephen Gera, as President. As of the Effective Date, and provided that the New Value Contribution has been paid to the Estate, the Reorganized Debtor's equity interests on the Effective Date will be owned 100% by the Plan Sponsor.

### C.    Appointment of Plan Administrator

On the Effective Date, Nicholas Rubin will be appointed as the Plan Administrator to take possession and control of the Cash and the New Value Contribution and to implement the terms of the Plan, including to object to or resolve Claims and make Distributions under the Plan. The Plan Administrator shall have all of the rights, claims, powers, objections, counterclaims, defenses, setoffs and actions of the Debtor and its Estate.

### D.    Employment of Employees and Professionals by Plan Administrator

Subsequent to the Effective Date, the Plan Administrator may employ and compensate

such employees and professionals, including, without limitation, any professionals employed by the Estate, agents and representatives, including disbursing agents, as the Plan Administrator determines is necessary or appropriate to implement all of the provisions of the Plan without any supervision of, or approval by, the Bankruptcy Court or the U.S. Trustee.  The Plan Administrator shall be allowed to pay the fees of the Plan Administrator's professionals without the requirement to file fee applications and seek approval of the Bankruptcy Court.

**E.      Compensation of Plan Administrator**

The Plan Administrator shall be compensated as provided in a supplement to the Plan.

**F.      Creation of Reserves and Distribution of Cash**

After the Effective Date, the Plan Administrator shall: (i) pay or provide for all expenses of the Estate from the Estate's Cash and the New Value Contribution, (ii) establish and maintain a reserve for expenses of the Estate and the Plan Administrator, (iii) establish and maintain a reserve for Disputed Claims, (iv) establish and maintain a reserve for unclaimed Distributions, (v) establish any other reserves or accounts it deems necessary or appropriate, and (vi) make Distributions in accordance with the Plan.

**G.      No Action Against Plan Administrator Without Bankruptcy Court Approval**

On and after the Effective Date, no action or proceeding may be commenced or continued by any entity holding a pre-Confirmation Claim, other than the Estate and the Plan Administrator, in any court or other tribunal, other than the Bankruptcy Court, against the Plan Administrator without the prior approval of the Bankruptcy Court pursuant to a final order.  On and after the Effective Date, no act to collect or recover from, or offset against, or to create, perfect or enforce any right, claim, interest or remedy by any entity, other than the Estate and the Plan Administrator, against the Plan Administrator on account of a pre-Confirmation Claim, may be taken without the prior approval of the Bankruptcy Court in a final order.

**H.      Termination of the Estate and the Role of the Plan Administrator**

The Estate and the Plan Administrator's role shall terminate upon the completion of Distributions of Cash and the New Value Contribution and entry of a final decree, unless the Court orders otherwise upon the request of the Plan Administrator.

**I.      No Recourse Against the Plan Administrator**

No recourse shall ever be had, directly or indirectly, against the Plan Administrator or any of the employees, professionals, agents or representatives of the Plan Administrator, whether by legal, equitable or other proceedings, by virtue of any law, statute, regulation or otherwise, or by virtue of any indebtedness of the Debtor, its Estate or the Reorganized Debtor, it being expressly understood and agreed that all liabilities of the Debtor shall be enforceable only against and be satisfied only out of the property of the Estate in accordance with the Plan.

**J.      Disbursing Agent**

The Plan Administrator or the Plan Administrator's agent will act as the disbursing agent for the purpose of making all Distributions to creditors under the Plan.

**K.**     **Non-Waiver of Privilege**

Nothing in the Plan shall constitute a waiver of any privilege claims over any of the documents, including any privileged documents that are produced to or received by the Plan Administrator.

**L.**     **Cancellation of Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtor under the DIP Credit Agreement and the Prepetition Credit Agreement and any other certificate, security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any ownership interest in the Debtor giving rise to any Claim or Interest shall be cancelled as to the Debtor, and the Plan Administrator shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing any such ownership interest in the Debtor shall be released. Notwithstanding the foregoing, no executory contract or unexpired lease (i) that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date.

**M.**     **Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects.  All matters provided for in the Plan or deemed necessary or desirable by the Debtor before, on, or after the Effective Date involving the Debtor's corporate structure, and any corporate action required by the Debtor, Reorganized Debtor or the Plan Administrator in connection with the Plan or the Debtor's corporate structure shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, members, or officers of the Debtor.  Before, on, or after the Effective Date, the appropriate officers, security holders, directors, and managers of the Debtor or Reorganized Debtor, as the case may be, or the Plan Administrator, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtor.  The authorizations and approvals contemplated by this Article VII.M shall be effective notwithstanding any requirements under non-bankruptcy law.

**N.**     **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Estate after the Effective Date, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

O.     **Section 1145 Exemption**

In reliance upon an exemption from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), and of state and local securities laws afforded by section 1145 of the Bankruptcy Code, any stock to be issued pursuant to the Plan on and after the Effective Date need not be registered under the Securities Act or any state or local securities laws. Such stock will not be subject to any statutory restrictions on transferability and may be resold by any holder without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. Entities who believe they may be "underwriters" under the definition contained in section 1145 of the Bankruptcy Code are advised to consult their own counsel with respect to the availability of the exemption provided by section 1145 of the Bankruptcy Code. The foregoing exemption provided for under section 1145 of the Bankruptcy Code applies to issuance of securities in connection with the Plan and the exemption shall not be effective as to future issuance of stock (other than pursuant to the Plan).

P.     **Section 1146 Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property under or in connection with the Plan or pursuant to: (i) the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Combined Disclosure Statement and Plan relating to the Debtor or the Estate; (ii) the creation, modification, consolidation, termination, refinancing, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment, or recording of any lease or sublease; or (iv) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any law imposing a stamp tax or similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

Q.     **Estate Claims & Causes of Action Preserved and Revested in Reorganized Debtor**

In exchange for the New Value Contribution, any Estate Claim, including claims and causes of action under chapter 5 of the Bankruptcy Code (the "Estate Claims and Causes of Action") shall be transferred to and revested in the Reorganized Debtor.

The Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Estate Claims and Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action to be included in a Plan Supplement, and the Estate's rights to commence, prosecute, or settle such Estate Claims and Causes of Action shall be preserved and

revested in the Reorganized Debtor, other than the Estate Claims and Causes of Action released by the Debtor pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof (which includes releases of avoidance actions), which shall be deemed released and waived by the Debtor and the Reorganized Debtor as of the Effective Date.  For avoidance of doubt, to the extent not released under such provision, the Reorganized Debtor shall be deemed to have released the avoidance actions upon the Effective Date.

The Reorganized Debtor may pursue such Estate Claims and Causes of Action, as appropriate, for its own benefit, in its discretion.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Estate Claims and Causes of Action against it as any indication that the Reorganized Debtor will not pursue any and all available Estate Claims and Causes of Action against it.  The Reorganized Debtor expressly reserve all rights to prosecute any and all Estate Claims and Causes of Action against any Entity.**  Unless any Estate Claims and Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtor expressly reserves all Estate Claims and Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Estate Claims and Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Estate Claims and Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, Order, or approval of the Bankruptcy Court.

## R.    Health and Benefit Plans of the Debtor and Reorganized Debtor

Any health and/or benefit plans, including any 401(k) plans, of the Debtor existing as of the Effective Date, including all such plans pursuant to which the Debtor is an administrator or in which current or former employees of any Debtor participate, may be terminated in accordance with applicable law.

## S.    Closing the Chapter 11 Case

After the Effective Date, the Plan Administrator may file a motion to close the Chapter 11 Case for all purposes.

## ARTICLE VIII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A.    Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each executory contract or unexpired lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease is: (i) the subject of a motion to assume such executory contracts or unexpired leases that is pending on the Effective Date; (ii) on the Assumed

Contracts or Leases List; (iii) a contract, lease, or other agreement or document entered into in connection with the Plan; (iv) included on any list of contracts or leases designated for assumption and assignment in connection with the Plan, as further discussed below; or (v) an insurance policy.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a final order approving the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan.  Any motions to assume executory contracts or unexpired leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a final order.

Notwithstanding the foregoing, those executory contracts and unexpired leases listed on **Exhibit 4** (the "Assumed Contracts and Leases List") to the Plan shall be deemed assumed and if applicable assigned to the Reorganized Debtor.  Parties to executory contracts and unexpired leases proposed to be assumed and assigned by the Debtor will receive notice of the Debtor's intent to assume and assign and a proposed cure amount ("Cure Amount"), as calculated by the Debtor, to cure the necessary defaults in connection with such executory contract or unexpired lease.  For the avoidance of doubt, should the Debtor and a party to an executory contract or unexpired lease be unable to resolve a dispute as to a Cure Amount, the parties may schedule the matter for a hearing before the Bankruptcy Court.  If a dispute as to a Cure Amount is resolved unfavorably to the Debtor, the Debtor may elect not to assume such executory contract or unexpired lease.  The Debtor shall have the right to modify the Assumed Contracts and Leases List at any time prior to the Effective Date.

**B.    Insurance Policies**

Notwithstanding anything to the contrary in the Combined Disclosure Statement and Plan, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of or object to any releases):

a.    all insurance policies are treated as and deemed to be executory contracts under the Plan and, on the Effective Date, the Estate shall be deemed to have assumed all insurance policies; and

b.    nothing alters, modifies, amends, impairs or otherwise affects the terms or conditions of any insurance policy or the rights and obligations thereunder.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the assumption of each of the insurance policies.  In addition, on and after the Effective Date, the Estate shall not terminate or otherwise reduce, limit, or restrict the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors, managers, officers, members, and trustees of the Debtor who served in such capacity at any time prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies, shall be entitled to the full benefits of any such D&O Liability Insurance Policy for the full term of such policy regardless of whether such directors, managers, officers, members, or trustees remain in such positions after the Effective Date.  Notwithstanding anything to the contrary in the Plan, all of the Debtor's current and former directors', managers', officers', members', and trustees' rights, if any, as beneficiaries of the D&O Liability Insurance Policies are preserved to the extent set forth herein.

C.    **Indemnification Obligations**

Any obligations of the Debtor pursuant to its organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any person pursuant to the Debtor's organizational documents, policy of providing employee indemnification, applicable state law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such persons based upon any act or omission related to such persons' service with, for, or on behalf of the Debtor prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtor shall survive Confirmation of the Plan and except as set forth herein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; *provided, however*, that all monetary obligations under this provision shall be limited solely to available insurance coverage and neither the Debtor, the Estate, the Plan Administrator or the Reorganized Debtor, nor any of the Assets thereof shall be liable for any such obligations.  The Debtor's indemnification obligations shall not apply to or cover any Claims, suits, or actions against a person that result in a final order determining that such person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing, or breach of the duty of loyalty.

D.    **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by a final order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court by the later of (i) the date set forth in an order of the Bankruptcy Court (including the Confirmation Order) authorizing the Debtor to reject contracts or leases pursuant to section 365 of the Bankruptcy Code (unless the order authorizing such rejection provides otherwise), (ii) thirty (30) days after the claimant is served with notice of the applicable Bankruptcy Court order, and (iii) thirty (30) days after the date of service of the notice of the Effective Date.  **Any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time may be forever barred, estopped, and enjoined from: (a) asserting such Claim against the Debtor, the Estate, the Plan Administrator, the Reorganized Debtor, or the property of any of the foregoing, or thereafter filing a Proof of Claim with respect thereto in the Chapter 11 Case; (b) being treated as a creditor of the Debtor for the purposes of voting on the Plan with respect to such Claim; and (c) receiving or being entitled to receive any payment or Distribution from the Debtor or the Estate, as applicable, with respect to such Claim**.  All Claims arising from the rejection of the Debtor's executory contracts or unexpired leases shall be classified as General Unsecured Claims and, if Allowed, shall be treated as General Unsecured Claims under the Plan.

E.    **Preexisting Obligations to Debtor under Executory Contracts & Unexpired Leases**

Rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor under such executory contracts or unexpired leases, to the extent of applicable law.  In particular, to the extent afforded by applicable law, the Estate and the Plan Administrator expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide warranties or continued obligations concerning goods previously purchased or services previously received by the Debtor contracted from non-debtor counterparties to rejected

executory contracts or unexpired leases.

**F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and executory contracts and unexpired leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**G.    Reservation of Rights**

Nothing in the Plan shall constitute an admission by the Debtor that any contract or lease is an executory contract or unexpired lease or that the Estate or the Plan Administrator has any liability thereunder.

**ARTICLE IX**

**CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING**

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.    THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**A.    The Plan May Not Be Accepted**

The Debtor can make no assurances that the requisite acceptances of the Plan will be received.  If the Plan is not accepted by creditors, then the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code.

**B.    The Plan May Not Be Confirmed**

Even if the Debtor receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan.  Even if the Bankruptcy Court determines that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for

Confirmation have not been met.  Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If the Plan is not confirmed, then the Plan will need to be revised and it is unclear whether a chapter 11 reorganization or liquidation of the Debtor's Assets could be implemented and what Distribution the holders of Allowed Claims would receive.  If an alternative cannot be agreed to, it is possible that the Debtor would have to liquidate its remaining Assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative would be similar to or as favorable to creditors as those proposed in the Plan.

**C.**     **Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections**

Projected Distributions are based on good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in the Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Debtor's estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtor's estimates, or the funds available for Distribution to such Class are lower than the Debtor's estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

**D.**     **Objections to Classification of Claims**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtor believes that all Claims and Interests have been appropriately classified in the Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member.  The Debtor believes that under the Bankruptcy Rules, it would be required to re-solicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees

to a less favorable treatment of its Claim or Interest.  The Debtor believes that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy this requirement, the Bankruptcy Court could deny Confirmation of the Plan.  Issues or disputes relating to classification or treatment could result in a delay in the Confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

E.      **Failure to Consummate the Plan**

The Plan provides for certain conditions that must be satisfied or waived prior to the Effective Date.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

F.      **Debtor Release or Injunction Provisions May Not Be Approved**

The Combined Disclosure Statement and Plan contains a Debtor release and certain exculpations and injunction language.  Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtor and certain third parties.

THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.

There can be no assurance that the releases and injunction provided in Article XIV of the Plan will be granted.  If the Bankruptcy Court does not grant such relief, this may result in the Plan not being confirmed or a plan of liquidation that differs from the Plan.

G.      **Certain Tax Considerations**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtor.  The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Internal Revenue Code of 1986, as amended (the "IRC"), embodies many complicated rules which make it difficult to state completely and accurately all of the tax implications of any action.

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtor.  This summary does not address the federal income tax consequences to creditors or interest holders.  This summary does not address foreign, state or local income tax consequences, estate or gift tax consequences of the Plan.

This summary is based on the IRC, the Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rulings and pronouncements of the Internal Revenue Service currently in effect.  These authorities are all subject to change, possibly with retroactive effect, and any such change could alter or modify the federal income tax consequences described below.

THE TAX CONSEQUENCES TO CREDITORS OR INTEREST HOLDERS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH HOLDER.  CREDITORS MAY RECOGNIZE INCOME OR LOSS AS A RESULT OF THE PLAN.   THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED.   THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH CREDITOR IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

The IRC provides that a debtor in a Chapter 11 bankruptcy case must reduce certain of its tax attributes by the amount of any cancellation of indebtedness ("COD") income that is realized as a result of the bankruptcy plan, instead of recognizing the income.  COD income is the excess of the amount of a taxpayer's indebtedness that is discharged over the amount or value of the consideration exchanged therefor.  As a result of the discharge and satisfaction of Claims pursuant to the Plan, the Debtor will realize some COD income, and, accordingly, the Debtor will reduce certain tax attributes by the amount of unrecognized COD income.

Tax attributes that are subject to reduction include net operating losses, capital losses, loss carryovers, certain tax credits and, subject to certain limitations, the tax basis of property. The reduction of tax attributes occurs after the determination of the Debtor's tax for the taxable year in which the COD income is realized.

Payments of interest, dividends, and certain other payments are generally subject to withholding unless the payee of such payment furnishes such payee's correct taxpayer identification number (social security number or employer identification number) to the payor. The Debtor may be required to withhold the applicable percentage of any payments made to a holder who does not provide its taxpayer identification number.  Backup withholding is not an additional tax, but an advance payment that may be refunded to the extent it results in an overpayment of tax.

THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.   SUCH CONSEQUENCES   MAY   ALSO   VARY   BASED   ON   THE   INDIVIDUAL CIRCUMSTANCES OF EACH CREDITOR OR INTEREST HOLDER.  ACCORDINGLY, EACH CREDITOR IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

## ARTICLE X

## MANNER OF DISTRIBUTIONS UNDER THE PLAN

### A.  Objections to Claims

#### 1.  Authority to Object to, and to Compromise, Claims

The Debtor, the Plan Administrator, or the Reorganized Debtor, will have the right to file objections to the allowance of any Claims, including the right to assert counterclaims and setoff rights.  The Plan Administrator will have the authority, in the reasonable exercise of the Plan Administrator's business judgment, to settle or compromise any Claim following the Effective Date without Court approval.

#### 2.  Disallowance of Certain Scheduled Claims

Pursuant to Rule 3003(c)(2) of the Federal Rules of Bankruptcy Procedure, those creditors whose Claims were scheduled as disputed, contingent or unliquidated and who did not timely file a Proof of Claim shall not be treated as creditors for purposes of voting or Distribution under the Plan.  The Order confirming the Plan shall include a provision that all such Claims are disallowed and shall not receive a Distribution under the Plan.

#### 3.  Estimation of Claims

As provided by section 502(c) of the Bankruptcy Code, the Bankruptcy Court may, upon motion of the Debtor, the Plan Administrator, or the Reorganized Debtor, as the case may be, estimate any contingent, unliquidated, or Disputed Claims to the extent necessary or required, and for any purpose the Court deems fit, including, but not limited to, voting and/or Distribution purposes.

#### 4.  Retention of Jurisdiction to Determine Allowance of Claims After the Effective Date

The Court will retain jurisdiction over the Chapter 11 Case to resolve any objections to Claims which are filed after the Effective Date or which are filed prior to the Effective Date but which are not resolved to final order prior to the Effective Date.  The Confirmation Order shall not be *res judicata*, collateral estoppel, or other bar to the Debtor's, the Reorganized Debtor's, or the Plan Administrator's right to object to such Claims after the Effective Date.

### B.  Delivery Upon Resolution of Disputed Claims

The Plan Administrator will not make any Distribution to the holder of a Disputed Claim until such Disputed Claim becomes an Allowed Claim.  Pending a resolution of the Disputed Claim, the Plan Administrator will create the Reserve Account which will contain a proposed Distribution based on the treatment that the Disputed Claim would receive if it became an Allowed Claim.

Within sixty (60) days after a Disputed Claim becomes an Allowed Claim, the Plan Administrator will make the Distribution to the holder of such Allowed Claim from the Reserve Account in an amount equal to what the holder of such Allowed Claim would have received if the Claim had been allowed in such amount as of the Effective Date.

In the event that the Disputed Claim is disallowed, that portion of the Reserve Account which was designated for payment of the Disputed Claim will be distributed to Allowed Claims in accordance with the treatment set forth in this Plan.

## C.    *De Minimus* Cash Distributions

Notwithstanding anything to the contrary in this Plan, no Distributions shall be made on account of any Allowed Claim if the Distribution amount is less than $50.00.  Holders of Allowed Claims who would otherwise be entitled to a Distribution in an amount of less than $50.00 shall receive no Distribution on account of such Allowed Claim because the value of such Allowed Claim would be *de minimus* and the administrative costs associated with processing and mailing the Distribution to the holder of such Allowed Claim would likely exceed the amount of the Distribution.

## D.    Final Distribution

Upon resolution of all outstanding objections to disputed Claims, and the payment of all expenses and other obligations, subject to Article XI(I), the Plan Administrator shall cause the Distribution of all remaining Cash to each holder of an Allowed Claim in Class 3C Pro Rata in the proration that each holder's Allowed Class 3C Claim bears to the aggregate amount of all Allowed Claims in Class 3C.

## E.    Delivery of Distributions

All Distributions to holders of Allowed Claims not made by wire transfer shall be made at the address of each such holder as set forth in (i) any Proof of Claim Filed by such holder (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, a change of address notification provided by such holder in a manner reasonably acceptable to the Plan Administrator) or (ii) in the absence of a filed Proof of Claim, the Schedules of Assets and Liabilities.    Notwithstanding the foregoing, the manner of each Distribution shall be determined at the discretion of the Plan Administrator.

## F.    Undeliverable Distributions and Unclaimed Property

If any Distribution to a holder of an Allowed Claim is returned as undeliverable, then the Plan Administrator shall make reasonable inquiry for a correct current address.    If reasonable inquiry does not yield a correct current address, then the Plan Administrator shall have no further obligation to determine the correct current address of such holder and no Distribution to such holder shall be made unless and until the Plan Administrator is notified, in writing, by the holder of the correct current address of such holder within ninety (90) days of such Distribution, at which time a Distribution shall be made to such holder without interest. Amounts in respect of undeliverable Distributions shall be held in trust on behalf of the holder of the Allowed Claim to which they are payable by the Plan Administrator until the earlier of the date that such undeliverable Distributions are claimed by such holder and the date that is ninety (90) days after the date the undeliverable Distributions were made.  Thereafter, (i) such holder shall be deemed to have forfeited its right to any Distributions from the Plan Administrator or the Estate, and the Claims of such holder shall be forever barred and (ii) the amounts in respect of undeliverable Distributions shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Estate, as applicable, automatically and without the need for a further order of the Bankruptcy Court, for Distribution in accordance with the Plan.

### G.    **Fractional Cents**

No payment of fractional cents shall be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

### H.    **Forfeiture of Distribution**

If the holder of a Claim fails to cash a check payable to it within the time period set forth herein, fails to claim an undeliverable Distribution within ninety (90) days after issuance thereof, or fails to complete and return to the Plan Administrator the appropriate Form W-8 or Form W-9 within ninety (90) days of a request by the Plan Administrator, then such holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Plan Administrator or the Estate, and the Claims of such holder shall be forever barred.  The forfeited Distributions shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Estate automatically and without the need for a further order of the Bankruptcy Court for Distribution in accordance with the Plan.

### I.    **Further Distributions Not Feasible**

Notwithstanding anything to the contrary in the Plan, if the Plan Administrator determines that Cash is insufficient to make any further Distribution economically justifiable, the Plan Administrator may donate any remaining cash, not to exceed $5,000 without further Bankruptcy Court order, to a charitable organization.

### J.    **Manner of Payment Pursuant to the Plan**

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Plan Administrator, by check, wire transfer or such other method as the Plan Administrator deems appropriate under the circumstances.  Cash payments to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction in the Plan Administrator's sole discretion.   For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. dollars pursuant to the applicable published exchange rate in effect on the Effective Date. Cash payments in the form of checks issued by the Plan Administrator shall be null and void if not cashed within ninety (90) days of the date of the issuance thereof and shall be deemed undeliverable Distributions.

### K.    **Compliance with Tax Requirements**

The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with any tax withholding, payment, and reporting requirements.  The Plan Administrator may require, in the Plan Administrator's sole and absolute discretion and as a condition to the receipt of any Distribution, that the holder of an Allowed Claim complete and return to the Plan Administrator the appropriate Form W-8 or Form W-9, as applicable to each holder.  Notwithstanding any other provision of the Plan, (i) each holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations

imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon the Estate in connection with such Distribution, and (ii) no Distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements reasonably satisfactory to the Plan Administrator for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Estate in connection with such Distribution.

**L.    Allocations**

If any Allowed Claim consists of indebtedness and accrued but unpaid interest thereon, then any Distributions on account of such Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to any portion of the Allowed Claim for accrued but unpaid interest.

**M.    No Postpetition Interest on Claims**

Unless otherwise specifically provided for in section 506(b) of the Bankruptcy Code, a Final Order, the Plan, or the Confirmation Order, or required by applicable law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtor, and no holder of a prepetition Claim against the Debtor shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

**ARTICLE XI**

**SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

**A.    Termination of Claims and Interests**

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction and release, effective as of the Effective Date, of Claims and Interests of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtor or any of its Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and causes of action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtor prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim or proof of Interest based upon such debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtor with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the

Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the termination of all Claims and Interests subject to the occurrence of the Effective Date.

## B.    <u>Release of Liens</u>

Except as otherwise provided in the Plan or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, and in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, and required to be satisfied pursuant to the Plan, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Estate shall be fully released, settled, and compromised, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert automatically to the Debtor and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtor.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Debtor or the Reorganized Debtor as the case may be to evidence the release of such lien, including the execution, delivery, and filing or recording of such releases, and shall authorize the Debtor and the Reorganized Debtor to file UCC-3 termination statements (to the extent applicable) with respect thereto.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such liens.

## C.    <u>Releases by the Debtor</u>

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released by the Debtor and its Estate (collectively, the "<u>Releasing Parties</u>"), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any claim or cause of action by, through, or for the foregoing entities, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Releasing Parties whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Releasing Parties would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtor or the Estate, the business operations of the Debtor, actions taken by the Board of Directors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the Debtor's in- or out-of-court sale and restructuring efforts, the Prepetition Credit Agreement, the DIP Loans, the DIP Credit Agreement, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Combined Disclosure Statement and Plan, or any, instrument, release, or other agreement or document created or entered into in connection with the Combined Disclosure Statement and Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the Distribution of property under the Plan or any other related agreement, or upon any other act

or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided, however*, that any right to enforce the Plan or the Confirmation Order is not so released; *provided, further*, that nothing herein shall release any party from their obligations under the Plan.

## D.   **Exculpation**

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is exculpated from, any liability to any holder of a cause of action, Claim, or Interest for any act or omission taking place between and including the Petition Date and the Effective Date of the Plan in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Combined Disclosure Statement and Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Combined Disclosure Statement and Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the Distribution of property under the Plan or any other related agreement, negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by final order to have constituted bad faith, willful misconduct, actual fraud or gross negligence, but in all respects such entities shall be entitled to assert appropriate affirmative defenses, including reliance upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

## E.   **Injunction**

Except as otherwise expressly provided in the Combined Disclosure Statement and Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all entities who have held, hold or may hold Claims or Interests that have been released pursuant to the Combined Disclosure Statement and Plan or are subject to the exculpation set forth in Article XIII.D, with respect to any such causes of action, Claims, or Interests in the Debtor or the Estate, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, any of the Debtor's Assets, including property that is to be distributed under the terms of the Combined Disclosure Statement and Plan on account of any such Claims or Interests: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, other than any rights of setoff and recoupment that were exercised prior to the Petition Date or otherwise permissible under applicable law; and (v) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Combined Disclosure Statement and Plan, *provided, however*, this provision does not enjoin setoff or recoupment related to any Claims or Interests arising after the Effective Date.

## F.   **Protections Against Discriminatory Treatment**

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all entities, including governmental units, shall not discriminate against the Debtor or Reorganized Debtor, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to,

discriminate with respect to such a grant against, the Debtor or Reorganized Debtor, or another entity with whom the Debtor have been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

## G.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  All injunctions or stays in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## ARTICLE XII

## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

## A.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived by the Debtor pursuant to the provisions of Article XIV.B hereof:

> (i)  The Plan Sponsor shall have paid the New Value Contribution to the Estate;
>
> (ii) The Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order) in form and substance acceptable to the Debtor and the DIP Lender;
>
> (iii) The Debtor shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan; and
>
> (iv) The Plan Administrator shall have been appointed.

## B.    Waiver of Conditions

The conditions to consummation set forth in this Article XIV may be waived by the Debtor (with the consent of the DIP Lender) without further notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

## C.    Effect of Failure of Conditions

If consummation of the Plan does not occur, then the Plan shall be null and void in all respects and nothing in the Combined Disclosure Statement and Plan shall: (i) constitute a waiver or release of any claims by the Debtor, any holders of Claims or Interests, or any other entity; (ii) prejudice in any manner the rights of the Debtor, any holders of Claims or Interests, or any other entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by

the Debtor, any holders of Claims or Interests, or any other entity in any respect.

## ARTICLE XIII

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### A.    Modification and Amendments

The Debtor may modify this Plan at any time prior to Confirmation, subject to the requirements of Fed. R. Bankr. P. 3019(a).

The Reorganized Debtor or the Plan Administrator may seek to modify this Plan at any time after the Confirmation Date only if: (1) the Plan has not been substantially consummated; and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

"Substantial Consummation" of the Combined Disclosure Statement and Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE XIV

## RETENTION OF JURISDICTION

After the Confirmation of this Plan and occurrence of the Effective Date, in addition to jurisdiction which exists in any other court, the Bankruptcy Court will retain such jurisdiction as is legally permissible including for the following purposes:

A.    To resolve any and all disputes regarding the operation and interpretation of the Plan and the Confirmation Order;

B.    To determine the allowability, classification, or priority of Claims and Equity Security Interests upon objection by the Debtor, the Reorganized Debtor, the Plan Administrator, or any other party in interest with standing to bring such objection or proceeding;

C.    To determine the extent, validity and priority of any lien asserted against any Assets of the Estate, or any lien asserted against the Debtor arising prior to the Effective Date;

D.    To construe and take any action to enforce the Plan, the Confirmation Order, and any other order of the Bankruptcy Court issued in the Chapter 11 Case; to issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, the Confirmation Order, and all matters referred to in the Plan, the Confirmation Order; and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Case on or before the Effective Date with respect to any person or entity related thereto;

E.    To resolve any dispute regarding the implementation, execution, performance, consummation, or interpretation of the Plan or the Confirmation Order;

F.    To determine, to the extent necessary, any and all Professional Fee Applications;

G.    To determine any and all Administrative Claims;

H.    To determine motions, filed before the Effective Date, for the rejection,

assumption, or assignment of any executory contracts or unexpired leases not otherwise assumed or rejected under the Plan, as well as the allowance of any Claims resulting therefrom;

I.      To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters relating to the Chapter 11 Case and instituted during the pendency of the Chapter 11 Case, whether before, on, or after the Effective Date;

J.      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

K.      To modify this Plan under section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan such as may be necessary to effectuate its expressed intent and purpose;

L.      Except as otherwise provided in the Plan or the Confirmation Order, to issue injunctions or to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Confirmation Order, or to facilitate the execution or implementation by any person or entity of the Plan or the Confirmation Order;

M.      To issue such orders in aid of consummation of the Plan or the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or the Bankruptcy Rules; and

N.      To enter a final decree closing this Chapter 11 Case.

## ARTICLE XV

## MISCELLANEOUS PROVISIONS

**A.      Discharge**

On the Effective Date, the Debtor and the Reorganized Debtor will be discharged of liability for payment of debts incurred prior to the Effective Date as provided in section 1141(d) of the Bankruptcy Code; *provided*, *however*, that liabilities or obligations expressly imposed by this Plan will not be discharged.

**B.      Immediate Effect**

Subject to the terms hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtor, the Debtor's Estate, the Plan Administrator, the Plan Sponsor, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each entity acquiring property under the Plan or the Confirmation Order, and any and all counterparties to executory contracts and unexpired leases with the Debtor. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim, Interest, or debt has voted on the Plan.

**C.**     **Additional Documents**

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtor or the Plan Administrator, as applicable, and all holders receiving Distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**D.**     **Successors and Assigns**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each entity.

**E.**     **Dissolution of the Committee**

The Committee shall dissolve on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Case, except with respect to, and to the extent of any applications for professional fee or expense reimbursements for members of such Committee.  The Committee and its retained professionals may also participate in any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition creditors, including, but not limited to, any cases, controversies, suits, or disputes arising in connection with the consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order.  The professionals retained by the Committee shall not be entitled to assert any Administrative Claims nor shall they have an Allowed Administrative Claims for any services rendered or expenses incurred after the Effective Date, except in respect of the preparation and prosecution of any filed fee application and participation in any appeals.

**F.**     **Notices**

To be effective, all notices, requests and demands to or upon the Debtor shall be in writing (which may be by email), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received and telephonically confirmed, addressed to the following:

**REED SMITH LLP**
Jason D. Angelo, Esq.
Matthew P. Milana, Esq.
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile:  (302) 778-7575
Email: jangelo@reedsmith.com
Email: mmilana@reedsmith.com

- and -

**LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.**
David B. Golubchik, Esq.
Krikor J. Meshefejian, Esq.
2818 La Cienega Avenue
Los Angeles, CA 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dbg@lnbyg.com
Email: kjm@lnbyg.com

**G.      Entire Agreement**

Except as otherwise indicated, the Combined Disclosure Statement and Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**H.      Non-Severability of Plan Provisions**

The provisions of the Plan, including its release, injunction, exculpation, and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Debtor's consent consistent with the terms set forth herein; and (iii) non-severable and mutually dependent.

**I.      Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtor will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, therefore, no parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

**J.      Post-Effective Date Limitation of Notice**

After the Effective Date, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, persons and entities must file with the Bankruptcy Court a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Plan Administrator is authorized to limit the list of persons and entities receiving documents pursuant to Bankruptcy Rule 2002 to those persons and entities that have filed with the Bankruptcy Court such a renewed request; *provided, however*, that Plan Administrator shall also serve those parties directly affected by, or having a direct interest in, the particular filing in accordance with Local Bankruptcy Rule 2002-1(b).

**K.      Inconsistency**

To the extent that the Combined Disclosure Statement and Plan conflicts with or is inconsistent with any agreement related to the Combined Disclosure Statement and Plan, the provisions of the Combined Disclosure Statement and Plan shall control.  In the event of any inconsistency, ambiguity, or conflict between any provision of any of the foregoing documents,

and any provision of the Confirmation Order, the Confirmation Order shall control.

**L.      Closing of Chapter 11 Case**

The Plan Administrator shall, promptly after the full administration of the Chapter 11 Case, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Case.

Dated: February 9, 2026                    Respectfully submitted,

**GST, INC.**

*/s/ Nicholas Rubin*
Nicholas Rubin
Chief Restructuring Officer

54